E. MORRIS COX AND MARGARET S. COX., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1534–63—1538–63. Filed January 21, 1965.

*Julian N. Stern* and *Jerry H. Robinson*, for the petitioners.
*Roger A. Pott*, for the respondent.

The Commissioner determined the following deficiencies in income taxes for the year 1960:

| Docket No. | Petitioners | Deficiency |
|---|---|---|
| 1534–63 | E. Morris Cox and Margaret S. Cox | $11,636.46 |
| 1535–63 | Van Duyn A. Dodge and Helen H. Dodge | 9,174.07 |
| 1536–63 | Jack S. Logan and Wilmer G. Logan | 717.98 |
| 1537–63 | Joseph M. Fee and Elizabeth C. Fee | 717.97 |
| 1538–63 | Peter Avenali and Joan E. Avenali | 3,320.57 |

The cases were consolidated for trial.

Petitioners are the stockholders of Dodge & Cox, Inc., which elected to be taxed under subchapter S of the Internal Revenue Code of 1954 as amended. The issues presented herein for decision all concern the income of the corporation. They are as follows:

(1) Whether an accrual basis taxpayer which contracts to furnish investment management services during a period extending beyond the close of the taxable year is required to accrue and report as gross income for the taxable year (a) cash received in that year as an advance payment of the management fee, (b) amounts contractually due in that year, although not received, and (c) amounts not con-

---

[1] Proceedings of the following petitioners are consolidated herewith: Van Duyn A. and Helen H. Dodge, docket No. 1535–63; Jack S. Logan and Wilmer G. Logan, docket No. 1536–63; Joseph M. Fee and Elizabeth C. Fee, docket No. 1537–63; and Peter Avenali and Joan E. Avenali, docket No. 1538–63.

tractually due and not received, where the related services have not been performed.

(2) To the extent the Court accepts respondent's position as to the items of income above relating to the close of the corporation's taxable year, whether petitioners are entitled to treat the corresponding items at the beginning of the taxable year in the same manner, thereby eliminating them from income.

(3) If the corporation's method of reporting income is disapproved, whether expenses which had accrued in the taxable year but which had been "deferred" may now be deducted in the taxable year in question.

### FINDINGS OF FACT

The stipulated facts together with accompanying exhibits filed by the parties are incorporated herein by this reference.

The petitioners in each case, husband and wife residing in the San Francisco area, filed their joint income tax returns for the calendar year 1960 with the district director of internal revenue at San Francisco, Calif. The husbands will hereinafter sometimes be referred to as petitioners.

Petitioners owned all the outstanding stock of Dodge & Cox, Inc., a California corporation which was formed on February 4, 1959, and commenced business on March 1, 1959. Its books are maintained and its tax returns are filed on the basis of a fiscal year ending January 31. It employs the accrual method of accounting. Its income tax return for the 11-month period March 1, 1959, through January 31, 1960, was filed with the district director of internal revenue at San Francisco, Calif. The corporation elected to be taxed in accordance with subchapter S of the Interal Revenue Code of 1954, and accordingly a proportionate share of its income for the fiscal period ended January 31, 1960, was reported by each of the petitioners in the joint returns which he and his respective spouse filed for 1960.

The business of the corporation was originated by a partnership in 1933, and was operated under the name of Dodge and Cox from 1933 until March 1, 1959. On or about March 1, 1959, the partners transferred the assets and liabilities to the corporation in exchange for its capital stock in a transaction that was treated as a nontaxable transfer under section 351 of the Internal Revenue Code of 1954. The same accounting system and method of reporting income employed by the partnership was adopted by the corporation, except that the partnership reported its income on a calendar year basis. Such system had consistently been employed since 1933. The partnership filed returns for each year through 1959.

The business of the corporation is that of providing investment management services for its clients, and is operated in the same man-

ner as it had been operated by the predecessor partnership. In general a client, upon engaging the services of the corporation, turns over money or securities to a bank to be held in a custody account for him and the corporation directs what purchases and sales of securities are to be made in such account. The clients consist of individuals and trustees and in addition the Dodge & Cox Fund, a diversified open-end investment trust.

The corporation's activities looking towards the ultimate objective of providing investment management for its clients may be regarded as being divided generally into three categories: Research, account administration, and general administration.

The services of the "research department" are performed for all clients generally and without regard to the account of any single client. Its basic function is first to form an opinion with respect to the economic outlook for our country as it bears upon private business. This opinion is then used as a guide to overall diversification of the clients' accounts between bonds, preferred stocks, and common stocks. Finally, the research department must determine what particular lines of business or industry will be the subject of investment and in what proportions. The work of the research department culminates in what is called a "policy control account." This policy control account represents an application of the basic investment policy to an assumed dollar amount of investment and indicates by type of investment the amount that should be properly invested in each industry.

The "account administration department" actually applies the findings of the research department to the individual clients' accounts. The object is to bring the clients' accounts into proper alignment with the corporation's overall investment policy. If the corporation deems it advisable, it will initiate purchases or sales of securities for the accounts.

Services performed under the category of "general administration" consist principally of the following:

(a) With respect to each client, the corporation receives a monthly statement from the bank reflecting the transactions which have taken place in that particular client's custody account.

(b) The corporation maintains a separate ledger card for each client which reflects all transactions in the account. This ledger card is reconciled monthly with the statement received from the respective bank.

(c) The corporation maintains a list of the cost of the investments in each client's account. This list is always consulted prior to initiating the sale of any security.

(d) The corporation prepares a quarterly appraisal of each client's account. The date of each of the appraisals corresponds to the anniversary date of the opening of the particular account. However, the

prices upon which the appraisal is based are those prevailing on the nearest Monday to the anniversary date of the account. This appraisal is used not only for purposes of analysis, but is also the basis upon which the management fees (hereinafter referred to) of the corporation are computed.

(e) After each appraisal of an account, the corporation prepares a document entitled "Account Review." This document compares, on a percentage basis, the investments of the particular account with the investments indicated by the policy control account.

(f) The corporation prepares a summary each year of the capital gains and losses in each account.

All of the services are regularly performed by the corporation as a matter of course during the year.

The services performed by the corporation are not dependent upon the demand or request of its clients. Purchases and sales of securities in the clients' accounts are initiated by the corporation; it is extremely rare for a client to suggest to the corporation a particular transaction.

At the time any client other than the fund employs the corporation two separate contracts are executed, one between the client and the corporation (referred to as the "Managers") and the other between the client and the bank selected for the custody account. The second contract, sometimes described as "Letter of Instructions to the Bank" is incorporated by reference in the first contract and a copy thereof is physically attached to the first contract. In regard to compensation of the corporation the first contract provides:

The entire compensation of the Managers will be a quarterly fee, in advance, of $75 plus $1.25 on each $1000 of appraised value of the account up to $500,000 and $1.00 per $1000 over $500,000.

And that fee arrangement is referred to in the contract between the client and the bank as follows:

Upon presentation of the Managers' fee bill, a quarterly management fee of $75 plus $1.25 on each $1000 of appraised value of the account up to $500,000 and $1.00 per $1000 over $500,000 will be paid, in advance, by the Bank from the account to the Managers.

Also, the corporation is obligated under its agreement with the client to pay the bank custody charges quarterly in advance.

The corporation's billings to its clients reflect quarterly fees for the 3-month period commencing with the day on which the corporation's services are engaged and the corresponding day of every third month thereafter. Fees for clients other than the Dodge & Cox Fund bear the foregoing relationship to the appraised value of the account. Since it is necessary to appraise each client's account as of the close of business on the Monday nearest to the last day of the client's quarter and then to compute the fee, the quarterly bills are not sent out to the banks holding the respective custody accounts until 10 days to 2 weeks after

the end of the quarter being billed. The banks remit the fees to the corporation anytime from 2 days to 2 weeks after they receive the bill, depending on the bank involved.

Rarely have clients canceled the services of the corporation or its predecessor partnership during a quarterly period for which they have been billed. If a client dies during a quarter, the estate generally retains the services of the corporation at least until the end of the quarter. However, in those rare cases where the corporation's services have been canceled prior to the end of the client's quarter the corporation has followed the policy of refunding to that client a pro rata portion of the fee paid.

The corporation also receives a fee for each quarter of the calendar year from the fund equal to a percentage of the value of the assets of the fund as of the last day of the preceding quarter and subsequently adjusted to take into account daily fluctuations of the assets during the current quarter. This fee arrangement is spelled out in the agreement between the corporation and the fund as follows:

4. The Manager shall receive as and for its entire compensation as such Trust Manager and Investment Adviser within fifteen (15) days after the first day of each quarter of the calendar year, a fee of one-eighth of one per cent (1/8 of 1%) of the value of the Trust Fund determined as provided in Article X of said Declaration of Trust as of the last day of the preceding quarter. Such compensation shall be payable out of the Trust Fund and all additions to or withdrawals from the Trust Fund during a quarterly period shall be prorated and an adjusted fee computed as of the end of such quarter.

In respect of its clients generally the amounts billed by the corporation are, as of the last day of the particular calendar month, debited to accounts receivable and credited to an account entitled "Unearned fees." This entry is not physically placed on the corporation's books until after the end of the quarter.

As of the end of each of the corporation's quarters ending in January, April, July, and October, an entry is made on the corporation's books charging the "Unearned fees" liability account and crediting the "Earned fees" income account. The amount of the billed fees taken into income at this time is the total of computations of earned income for the quarter made with respect to each individual client. The earned income for each client represents the amount of that client's fee which was deferred at the beginning of the corporation's quarter plus that portion of the fee billed during the quarter which the number of days between the billing date (the date on which the corporation's services were engaged or the corresponding day of every third month thereafter) and the end of the corporation's quarter bears to the total number of days in the quarter. The result of this computation is to prorate each client's fee on a daily basis and thereby to take into earned income for any particular quarter that portion of a client's

fee which is attributable to the number of days actually within the quarter.

When the corporation took over the business of the partnership on March 1, 1959, it set up as a credit on its books the amount of $37,800.36 representing the balance in the "Unearned fees" account of the partnership at that date. This amount was reported as ordinary income by the corporation in its fiscal period ending January 31, 1960. Of this amount $30,483.41 had been billed and received by the partnership, $2,170.88 had been billed by the partnership but was collected by the corporation, and $5,146.07 was billed and received by the corporation.

The balance in the corporation's "Unearned fees" account at January 31, 1960, was $54,286.12. Of this amount $20,684.30 was billed and received by the corporation during the fiscal year ended January 31, 1960, $9,292.65 was billed during that fiscal year but not received until the following fiscal year, and $24,309.17 was neither billed nor received until the following fiscal year. Of the latter amount neither billed nor received until the following fiscal year, $6,047.73 was attributable to the fee of the fund (which was billed on February 12, 1960), and $18,261.44 represented bills for other clients. In his adjustments giving rise to the deficiencies herein the Commissioner determined that all of the $54,286.12 fees which the corporation treated as "unearned" as of January 31, 1960, must be included in its gross income for the taxable period ending on that date.

As expenses were incurred by the corporation, the transaction was entered in a vouchers payable register with a debit to "Prepaid expense" and a credit to "Vouchers payable." The corporation maintained a prepaid expense register for the purpose of accumulating the prepaid expense charges from the vouchers payable register. Each individual item of prepaid expense was then distributed as a charge against income of the corporation's fiscal quarter to which the expense was applicable.

When the corporation took over the business of its predecessor partnership, it set up as a debit on its books the amount of $9,973.09 representing expenses incurred by the partnership, but for which the charge against income had been deferred. Of this amount, $8,754.67 had in fact been paid by the partnership prior to March 1, 1959.

During the corporation's fiscal period ended January 31, 1960, expenses in the total amount of $23,374.86 were incurred by the corporation and charged to the "Prepaid expense" account. During this period, total expenses in the amount of $21,075.65 were taken out of the "Prepaid expense" account and deducted by the corporation. Of the total expenses thus deducted during the year, $7,014 were items

which were reflected in the beginning balance in the "Prepaid expense" account.

At January 31, 1960, the balance in the "Prepaid expense" account was $12,272.30, of which $9,908.85 had been paid prior to January 31, 1960.

As of January 31, 1960, the corporation had deferred bank custody charges which had been incurred in the amount of $7,470.99 and under its method of accounting did not deduct said charges on its income tax return filed for this taxable period. The Commissioner in his adjustments reflected in the statutory notices of deficiencies allowed this amount as a deduction to the corporation for the taxable period ended January 31, 1960.

### OPINION

RAUM, *Judge:* Dodge & Cox, Inc., an accrual basis corporation with a fiscal year ending January 31, performs investment management services for a number of clients, including Dodge & Cox Fund, a diversified open-end investment trust. The fees for its services are payable quarterly in advance and are measured by the appraised value of the clients' accounts. The fee for any particular client other than the fund is based upon the 3-month period commencing with the calendar day on which the corporation's services were engaged for that client and, upon reappraisal of the account, is recomputed for each subsequent 3-month period commencing on the corresponding day of every third month thereafter. The fee for the fund is determined for each quarter of the calendar year, equal to a percentage of the value of its assets as of the end of the preceding quarter and as subsequently adjusted to take into account daily fluctuation during the current quarter.

The issues herein arise by reason of the method employed by the corporation in reporting its fees as income. In essence, as to each client, the corporation treats as "earned" or reportable income as of the end of any month only that portion of that client's quarterly fee that is arithmetically allocable to the number of days within that month that fall within the client's current quarter. Thus, if there are 92 days in the client's current quarter and if that quarter commenced 20 days prior to the end of the current month, the corporation would treat as realized and reportable income as of the end of the month only 20/92 of the fee,[2] regardless of whether it had already received the fee in full and regardless of whether it had already presented its bill for that fee. The remainder of the fee would be treated as "unearned" income, and if there were 31 days in the following month, 31/92 of the fee would be taken out of "unearned" income as

---

[2] Of course, if this were not the client's initial quarter, there would also be included that portion of the fee for the client's preceding quarter that was allocable to the first part of the month.

of the end of such following month and included in "earned" or reportable income for that month. In substance, the corporation's method is to prorate each client's fee on a daily basis, and thus take into reportable income for any particular quarter *of its own* that portion of the client's fee which is attributable to the number of days within its own quarter. And that portion of the client's fee (even though already received or otherwise accrued) that spills over into the corporation's next quarter is treated as "unearned" and unreportable for the quarter just ended.

As already noted, the corporation employs a fiscal year ending January 31. Thus, at the end of its final quarter for the taxable period ending January 31, 1960, there were on its books "unearned" fees in the amount of $54,286.12. These "unearned" fees represented in the aggregate those portions of its clients' fees that were allocable to those portions of the clients' current quarters that extended beyond January 31, 1960. The Commissioner determined that the entire $54,286.12 must be included in the corporation's gross income for its fiscal period ending January 31, 1960; and at the same time he allowed as a deduction related bank custody charges in the amount of $7,470.99 which had already been incurred but which the corporation had similarly allocated to the period following January 31, 1960, and had not deducted for the period ending January 31, 1960.

The $54,286.12 item breaks down into several components. Of the total $54,286.12 fees involved, (a) $20,684.30 represents fees that were actually collected by the corporation during its fiscal period ending January 31, 1960; (b) $9,292.65 represents fees that were actually billed but not received during that period; and (c) $24,309.17 represents fees that had not yet been billed by January 31, 1960. We hold that the Commissioner was correct as to the first two components, and was correct only as to part of the third component, as hereinafter indicated.

(1) *The $20,684.30 and $9,292.65 Fees Received or Billed During the Fiscal Period Ending January 31, 1960.*—Whatever theoretical arguments might be urged in support of petitioners' position that the corporation properly allocated these fees to the following year, the matter has been authoritatively settled otherwise by the Supreme Court. *Schlude* v. *Commissioner*, 372 U.S. 128; *American Automobile Assn.* v. *United States*, 367 U.S. 687.

Petitioners point to certain possible distinctions—that here, unlike *Schlude*, the corporation's services were regularly performed and not "solely on demand of the customers," that here there was no income from cancellations, and that, unlike the present case, the studio in *Schlude* paid royalties and commissions that were deducted at once rather than being spread over the period during which the related income was earned. True, these factual differences exist, and these

considerations were noted by the Supreme Court in *Schlude*. But the Court rested its decision also upon another and more sweeping ground, namely, that in the absence of a specific statutory provision authorizing such practice, it was not open to a taxpayer under the Internal Revenue Code of 1954 to "defer" income to a later period. 372 U.S. at 134–135. The distinctions relied upon by petitioners are entirely irrelevant in respect of this more fundamental ground that governs all attempts to "defer" or postpone the reporting of income that has actually been received or accrued.

In this case the corporation is on the accrual basis and is therefore chargeable not only with the fees already in hand ($20,684.30) by the close of January 31, 1960, but also with those that had otherwise accrued at that time. The $9,292.65 fees that had already been billed were plainly then due and payable, and there can be no serious contention that they had not accrued by January 31, 1960. The *Schlude* case clearly requires that both the $20,684.30 and $9,292.65 items be treated as reportable income for the period ended January 31, 1960.

(2) *The $24,309.17 Fees Neither Billed nor Received.*—The third and final component of the $54,286.12 fees which the Commissioner charged to the corporation for the period ending January 31, 1960, consisted of $24,309.17 fees that it had neither received nor billed by the close of that fiscal period. That $24,309.17 item is in turn composed of two parts which require separate consideration and treatment, namely, $18,261.44 fees in respect of clients other than Dodge & Cox Fund, and $6,047.73 fee of the fund.

(a) *The $18,261.44 Unbilled Fees of Clients Other Than the Fund.*—In *Schlude*, following a concession by the Government, the Court remanded the case so that there could be excluded from income as not yet having been accrued those amounts "which were neither due as a matter of contract, nor matured by performance of the related services." 372 U.S. at 133 fn. 6, 137. We hold that the $18,261.44 fees herein fall within that description and should be accorded like treatment.

The Government seeks to avoid that result here by arguing that these fees were due as a matter of contract during the fiscal period ending January 31, 1960. To be sure, the clients' contracts with the corporation referred to the quarterly fees as payable "in advance," and the pertinent quarter of each client in respect of the $18,261.44 fees commenced prior to the close of that fiscal period. If that were all there was to the matter, the Government's position would probably be sound, and we would be constrained to conclude that these fees were due as a matter of contract during the fiscal period. However, the client's contract with the corporation incorporates by reference and has attached to it the client's instructions to the custodian bank, approved by the corporation. And those instructions authorize the

bank to pay the corporation's quarterly fee "in advance," "[u]pon presentation of the * * * [corporation's] fee bill."

The words "in advance" in the client's contract with the corporation are susceptible of interpretation, and it is clear to us that they were used here to mean merely that the corporation would be entitled to the fee upon presentation of its bill even though that event may occur at the beginning or in the early part of the client's quarter. The two documents must be read together, and when so considered, we conclude that the unbilled fees were not in fact payable under the contract with the corporation until billed, and, to the extent that they were not supported by services rendered, cf. *Dally* v. *Commissioner*, 227 F. 2d 724, 726–727 (C.A. 9), affirming 20 T.C. 894, certiorari denied 351 U.S. 908, they had therefore not yet accrued.[3]

(b) *The $6,047.73 Fee of the Fund.*—It must be remembered that the corporation's fee for its services to the fund was based upon each quarter of the calendar year; it was determined as of the last day of the preceding quarter, in this case December 31, 1959; it was payable "within fifteen (15) days after the first day" of the quarter, namely, not later than January 16, 1960; and it was subject to readjustment at the end of the quarter by reason of changing values during the quarter.

The bill in respect of the fee for the quarter beginning January 1, 1960, was not in fact presented until February 12, 1960. However, unlike the situation in respect of the other clients, there does not appear to be any contractual provision susceptible of being interpreted as making the time of payment depend upon presentation of the bill. The $6,047.73 fee became due and payable by the fund not later than January 16, 1960, during the corporation's fiscal period ending January 31, 1960.

Whether that amount had yet in fact been computed is of no moment. It was reasonably determinable during that period, cf. *Continental Tie & Lumber Co.* v. *United States*, 286 U.S. 290. The corporation had a right to receive it at that time, and it was therefore accruable. As was said in *Schlude* (372 U.S. at 137) :

For an accrual basis taxpayer "it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income," *Spring City Co.* v. *Commissioner*, 292 U.S. 182, 184; *Commissioner* v. *Hansen*, 360 U.S. 446, and here the right to receive * * * [this amount] had become fixed at least at the time * * * [it was] due and payable.

---

[3] The evidence satisfies us that the billing process normally required about 10 days or 2 weeks, and that the amount here involved relates largely if not entirely to fees in respect of accounts whose anniversary dates occurred within such period immediately prior to Jan. 31, 1960. Thus, this is not a case where a taxpayer has deliberately manipulated its billing procedure so as to prevent income from accruing that it would otherwise have become entitled to prior to the end of the taxable period. We express no opinion as to the tax consequences in the latter situation.

Nor is it a matter of consequence that, as indicated by the evidence, the bill had not been presented until February 12, 1960, because of the delay occasioned by the independent auditors. The point is that petitioners have failed to show that billing was a condition precedent to liability in the case of the fund. That liability accrued and was payable no later than January 16, 1960. And the fact that the amount was subject to subsequent readjustment at the end of the fund's quarter was no bar to accrual. Cf. *Continental Tie & Lumber Co.* v. *United States, supra.* We hold that the $6,047.73 item accrued during the fiscal period ending January 31, 1960.

(3) *The $37,800.36 "unearned fees" on the Corporation's Books as of March 1, 1959, Taken Over From the "unearned fees" Account of the Partnership.*—Petitioners make the alternative argument that to the extent that they are unsuccessful in their contention that the $54,286.12 "unearned fees" as of January 31, 1960, should not be charged to the corporation for the fiscal period ending at that time, the opening balance in the "unearned fees" account ($37,800.36) as of March 1, 1959, was properly chargeable to the predecessor partnership and should be excluded from the corporation's gross income of the taxable period. We agree.

The $37,800.36 "unearned fees" placed on the corporation's books as of March 1, 1959, consisted of $30,483.41 that had already been billed and received by the partnership, $2,170.88 that had been billed by the partnership but subsequently collected by the corporation, and $5,146.07 that was billed and collected by the corporation. In accordance with our decision relating to the "unearned fees" as of January 31, 1960, the first two of these components ($30,483.41 and $2,170.88) were properly accruable by the partnership and the third component ($5,146.07) was properly accrued by the corporation.[4]

In respect of the first two components, if the statute of limitations had not run against taxing the partners' distributive shares of partnership earnings, the matter would simply call for revision of such distributive shares for the earlier year. But since the period of limitations appears to have expired the Commissioner insists that the 1959 partnership income that was not in fact included in the partners' taxable distributive shares for that year may properly be included in the corporation's income for its fiscal period ending January 31, 1960. However, that position is flatly in conflict with our decision in *Heer-Andres Investment Co.*, 17 T.C. 786, 788–789 (second issue).

The Commissioner seeks to avoid the effect of *Heer-Andres* by call-

[4] Unlike the third component as of Jan. 31, 1960, which in turn consisted of two parts (one relating to the corporation's clients generally and the other relating to the fund) calling for diverse treatment, the $5,146.07 item would seem to relate solely to fees of clients other than the fund and therefore could accrue only when billed, on or after Mar. 1, 1959. It must be remembered that the fund was on a calendar quarter basis and it seems highly probable that by Mar. 1, 1959, the fund had already been billed for its quarter beginning Jan. 1, 1959.

ing attention to the fact that it was decided under the 1939 Code and that section 481 of the 1954 Code [5] was enacted to meet just the type of situation presented by that case. But his argument is confusing and unconvincing. If he were to rely affirmatively upon section 481 to justify an adjustment including the untaxed 1959 partnership income in the corporation's income for the fiscal period ending January 31, 1960, he would be faced with the contention that section 481 is inapplicable here. That section deals with a situation where a taxpayer's income is computed under a method of accounting different from the method "under which the taxpayer's taxable income *for the preceding taxable year was computed*" (italics supplied). And this Court has held these provisions inapplicable to the recomputation of the first year's income of a corporation that was the successor to a partnership, on the ground that the "taxpayer" had no "preceding taxable year." *Ezo Products Co.*, 37 T.C. 385, 393; cf. *Estate of John A. Biewer*, 41 T.C. 191, 197–198.

The Commissioner might have argued, but did not do so, that *Ezo* is not in point because the corporation herein is a subchapter S corporation and its income is attributed directly to its stockholders in the same manner that partnership income is attributed to the partners, with the consequence that the same taxpayers are involved and that the subchapter S corporation is merely a continuation of the old partnership for purposes of section 481 regardless of whether a subchapter S corporation itself may properly be treated as a taxpayer for other purposes elsewhere in the Code. Such argument would have a strong appeal in view of the underlying purpose of section 481, and the Commissioner might therefore have undertaken to justify his insistence that the "unearned fees" as of March 1, 1959, were correctly taken into account in computing the corporation's income under section 481. However, he made no such contention, and we express no opinion as to its merits. Instead, he made the strange argument that section 481 is inapplicable, citing *Ezo;* that section 481 provides the exclusive method for making adjustments; and that since section 481 is inapplicable petitioners were therefore not entitled to rely upon it in asking that the opening "unearned fees" account be eliminated in computing the corporation's income.

The difficulty with this contention is that petitioners nowhere rely

[5] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

upon section 481. Indeed, they explicitly disavow doing so. Their position simply is that the corporation's income for the period ending January 31, 1960, must be computed correctly, and that if the deferral method is wrong, the income for that period must be computed consistently without taking into account any deferred items. They do not seek to avoid the annual accounting system by asking for "adjustments" to income under section 481 that would not otherwise be appropriate under the annual accounting system, the situation dealt with by section 481. That was the kind of "adjustment" which the *Government* unsuccessfully sought in *Heer-Andres* and which would now be available to it under section 481; but it is entirely unlike petitioners' position herein that seeks only to have the corporation's income correctly computed for the year involved.

We hold that the corporation is chargeable with the $5,146.07 fees that it both billed and collected; and that the predecessor partnership rather than the corporation was chargeable with the $30,483.41 fees billed and collected by the partnership as well as the $2,170.88 billed by the partnership but collected by the corporation. Both of the latter two items represented income that had accrued in the hands of the partnership, and petitioners are entitled to have them excluded in computing the income of the corporation for the period ending January 31, 1960.

(4) Finally, petitioners make a further alternative contention that if the corporation's system of deferring income is to be rejected, then they should be entitled to the benefit of like treatment in respect of the $12,272.30 expenses incurred prior to the close of January 31, 1960, and deferred by the corporation to the following year. They concede that in such circumstances, the corresponding $9,973.09 expenses incurred by the predecessor partnership and appearing on the corporation's opening balance sheet must be offset against the $12,272.30 expenses deferred on the closing balance sheet for this taxable period, thus making a net additional deduction of $2,299.21. The Government has not objected to this contention. We think it is sound, and it will be given effect under the

*Decisions to be entered under Rule 50.*