T.C. Memo. 2001-175


UNITED STATES TAX COURT


WESTPAC PACIFIC FOODS,
SAVE MART, TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12400-99.                    Filed July 16, 2001.


<u>Andrew A. Bassak</u> and <u>Alvin T. Levitt</u>, for petitioner.

<u>Andrew R. Moore</u> and <u>Lloyd T. Silberzweig</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  By way of separate notices of final partnership administrative adjustment, respondent determined that Westpac Pacific Foods (Westpac) failed to report $5,572,538 and $4,922,945 of gross income for taxable years 1990 and 1991, respectively.  The sole matter for decision is whether certain upfront payments that Westpac received in consideration of

entering various purchasing contracts constitute income in the year of receipt.  All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure

## FINDINGS OF FACT

Westpac is a general partnership whose principal offices were located in Stockton, California, at the time the petition in this case was filed.[1]  Westpac was formed for the purpose of acquiring land, constructing a warehouse facility, and operating such facility for the storage of food and other products sold to the following three grocery store chains:  Raley's Inc. (Raley's), Save Mart Supermarkets, Inc. (Save Mart), and Bel Air Mart, Inc. (Bel Air).  Raley's and Save Mart each owned 45 percent of Westpac, and Bel Air owned the remaining 10 percent.  During the years in issue, Westpac used the accrual method of accounting for tax reporting purposes.

GTE Sylvania Contract

On or about July 12, 1990, Westpac entered into an agreement with Sylvania Lighting division of GTE Products Corp. (GTE Sylvania) by which Westpac agreed to (1) make GTE Sylvania its exclusive branded lamp supplier for Westpac and its member stores for a 4-year term; (2) "aggressively and regularly" advertise and

---

[1]  Westpac changed its name from Westpac Pacific Foods to Super Store Industries (SSI) at some point in 1991.  For the sake of convenience, references to Westpac include references to SSI.

promote GTE Sylvania's products; (3) dedicate on average at least 12 lineal feet of shelf space to GTE Sylvania's products in its member stores; and (4) purchase $17 million in lamp products during the term of the agreement.  In consideration of Westpac's volume purchase commitment, GTE Sylvania agreed to pay Westpac $1,100,000 as an "unearned advance allowance".  This allowance was paid to Westpac by check dated July 31, 1990.  GTE Sylvania further agreed to pay Westpac $200,000 on the first, second, and third anniversaries of the agreement, provided that Westpac established to the satisfaction of GTE Sylvania an adequate warehouse distribution arrangement.  During Westpac's 1991 tax year, GTE Sylvania paid to Westpac the first $200,000 annual installment.

The contract refers to the total $1,700,000 in payments as the "Westpac Allowance" and contains the following passage regarding Westpac's obligation to repay such allowance:

> Upon termination of this Agreement, WestPac will reimburse GTE Sylvania on a pro-rated basis for any portion of the WestPac Allowance advanced to WestPac but not earned due to the failure by WestPac to purchase at least $17.0 million in lamps.

GTE Sylvania further reserved the right to decrease the Westpac Allowance if, in its judgment, Westpac did not (1) use its best efforts to promote and purchase for resale GTE Sylvania branded lamps or (2) dedicate on average at least 12 linear feet of shelf space to GTE Sylvania products through its member stores.

By letter dated August 18, 1994, Westpac terminated its contract with GTE Sylvania effective October 3, 1994, due to lack of sales volume.  The termination letter recognized Westpac's obligation to repay a prorated portion of the Westpac Allowance. In December 1994, Westpac repaid GTE Sylvania a prorated amount totaling $861,857.

Ambassador Contract

On or about August 24, 1990, Westpac entered into an agreement dated August 14, 1990, with Ambassador Cards (Ambassador), a division of Hallmark Cards, Inc.  Westpac agreed to maintain Ambassador as its primary supplier of social expression merchandise and committed its member grocery store chains (excepting those Save Mart stores which were under an existing contract with American Greetings Corp.) to purchase $61,047,000 worth of goods from Ambassador.  In exchange, Ambassador agreed to (1) pay Westpac $4,572,000 upon execution of the contract; (2) provide each member store a credit equal to the wholesale value of the opening order of everyday Ambassador merchandise; (3) issue a quarterly credit to each member grocery store chain equal to 5 percent of the total net wholesale purchases of Ambassador products made by Westpac's member stores as a group; and (4) issue a credit equal to 5 percent of net wholesale purchases to any store that later became subject to

the agreement for a period of 12 months after Ambassador's merchandise was installed.[2]

The agreement required Westpac to repay a pro rata portion of the $4,572,000 upfront cash payment and the initial inventory purchase credit if one of Westpac's member stores ceased operations. The contract defined the pro rata repayment obligation in terms of the percentage of the volume purchase commitment that remained unsatisfied at the time.

On March 14, 1994, Westpac and Ambassador executed an addendum to their contract. The addendum increased Westpac's volume purchase obligation to $76,047,000. The addendum also called for Ambassador to pay Westpac (1) $1,225,000 to cover the cost of opening inventory in additional stores that became covered under the agreement and (2) $1,225,000 as an additional placement allowance. Ambassador, through its affiliate Hallmark Marketing Corp., made the combined $2,450,000 payment by check dated April 29, 1994.

In March 1997, Westpac and Ambassador discussed the possibility of terminating their contract. In the course of these discussions, Ambassador prepared a letter setting forth the

---

[2] This last credit provision was aimed primarily at the Save Mart stores which Ambassador anticipated would join the agreement at the conclusion of the preexisting contract between Save Mart and American Greetings Corp.

amounts that Westpac would be required to repay to Ambassador upon termination. This letter included a table entitled "Super Stores Industries Payback Calculation for Early Contract Termination" that listed the amount of payments Westpac received under the contract and the volume of purchases Westpac had achieved through December 1996. The table calculated the repayment amount on a pro rata basis in proportion to Westpac's percentage completion of the volume purchase requirement. After discussing the possibility of terminating the contract, the parties decided against it.

American Greetings Contract

On or about January 10, 1991, Save Mart entered into an agreement with American Greetings Corp. (American Greetings) in which Save Mart agreed to make American Greetings its "exclusive supplier" of everyday and seasonal counter cards, tray packs, wraps, bows, and other auxiliary products. Save Mart further agreed to maintain in its stores the then-existing lineal footage dedicated to American Greetings products.

The term of the American Greetings contract ran from January 1, 1991, to December 31, 1995. If, however, Save Mart had not purchased $17,970,000 in products from American Greetings by December 31, 1995, the contract term would be automatically extended until such time as Westpac met this volume purchase target.

In exchange for Save Mart's commitments, American Greetings agreed to provide Westpac with the following: (1) A credit of $100 per lineal foot dedicated to American Greetings products in newly constructed stores or newly acquired stores not carrying American Greetings products; (2) an annual discount equal to 5 percent of the increase in purchases made in the prior year over that made in the year before the prior year; (3) a 1.5-percent discount on total net receipts to American Greetings from Save Mart purchases, creditable each quarter; (4) additional discounts totaling $1,250,000 "in lieu of periodic volume discounts", creditable upon execution of the agreement; and (5) a 5-percent advertising allowance based on the sale of everyday and seasonal counter cards.

Whereas the contract called for the $1,250,000 discount to be made in the form of a credit, the parties subsequently agreed that payment would be made in cash. The parties also agreed that the cash payment would be made to Westpac instead of directly to Save Mart.[3]

Save Mart and American Greetings terminated their contract before Save Mart satisfied its volume purchase commitment. Although the contract contained no express provision requiring

---

[3] Evidently, the payment was assigned from Save Mart to Westpac because Westpac's owners had agreed to pool the advance payments which they received under this and other long-term purchase contracts.

the repayment of any portion of the upfront payments received by Save Mart or Westpac, American Greetings calculated Westpac's repayment obligation at $406,243 on a prorated calendar basis. Westpac's internal correspondence reflected a repayment obligation of $512,500 based on the percentage of the volume purchase commitment it had satisfied. Accordingly, Westpac accepted American Greetings' lower demand and paid American Greetings $406,243 by check dated September 28, 1995. The check stub contains a notation that the payment constitutes a "repayment of contract adv[ance]".

McCormick Contract

On or about March 4, 1991, Westpac entered into an agreement with McCormick & Co., Inc. (McCormick), dated February 27, 1991, by which Westpac agreed to use McCormick as its "primary supplier" of spices, extracts, foil seasonings, mixes, gourmet spices, and cake decorations. In addition, Westpac agreed to purchase $50 million in McCormick products over an indefinite period.

In consideration of Westpac's commitments, McCormick agreed to make a series of cash payments to Westpac and to supply Westpac with certain amounts of free products. In particular, McCormick agreed to pay Westpac $5 million[4] and to provide

---

[4] McCormick actually paid Westpac $4,801,000 during the 1991 taxable year.

Westpac with $1 million worth of free products upon execution of the agreement. McCormick further agreed to make the following "incentive payments" as Westpac achieved various volume purchase targets:

| Volume Level | Cash Payment | Free Product |
|---|---|---|
| $10,000,000 | $3,000,000 | $750,000 |
| 20,000,000 | 2,000,000 | 750,000 |
| 30,000,000 | 2,000,000 | 750,000 |
| 40,000,000 | 1,000,000 | 750,000 |

The contract obligated Westpac "to repay any unearned prepaid allowances on a pro rata basis" in the event Westpac failed to satisfy the entire $50 million volume purchase commitment.

Westpac's Financial and Tax Reporting

Westpac recorded the upfront cash payments which it received from GTE Sylvania, Ambassador, American Greetings, and McCormick as liabilities in favor of the manufacturers. For financial and tax accounting purposes, Westpac would treat a portion of the payment which it considered earned (that is, the amount of the total payment received multiplied by the percentage of the volume purchase commitment satisfied during the year in issue) as either an item of "other income" or as a reduction to its cost of goods sold. Specifically, on its 1990 tax return, Westpac reported what it considered to be the earned portions of the upfront cash payments received on the Ambassador and GTE Sylvania contracts as other income because Westpac had no cost of goods sold during

that year which to offset.[5]  In 1991, Westpac reported what it considered to be the earned portions of the upfront cash payments received on the McCormick and American Greetings contracts as a reduction to its cost of goods sold.  Westpac intended to treat similarly the deemed earned portions of the upfront cash payments received on the Ambassador and GTE Sylvania contracts as reductions to its cost of goods sold, but its income tax preparer mistakenly continued the "other income" treatment for these amounts from the prior year's tax return.

The chart below summarizes the upfront cash payments that Westpac received in the years in issue as well as the portion of such payments Westpac recognized as income for tax purposes during those years:

| Contract | Cash Payments | | Income Recognized | |
|---|---|---|---|---|
| | 1990 | 1991 | 1990 | 1991 |
| McCormick | -0- | $4,801,000 | -0- | $571,628 |
| Ambassador | $4,572,000 | -0- | $119,878 | 329,705 |
| American Greetings | -0- | 1,250,000 | -0- | 293,102 |
| GTE Sylvania | 1,100,000 | 200,000 | 87,947 | 87,862 |
| Total | 5,672,000 | 6,251,000 | 207,825 | 1,282,297 |

Respondent determined Westpac was required to include in income the full amount of the upfront cash payments in the taxable year in which such payments were received.[6]

---

[5]  During 1990, Westpac's warehouse operation had not been completed, and therefore all purchases under the Ambassador and GTE Sylvania contracts were made directly by Westpac's partners.

[6]  Westpac received certain payments under a contract which it entered into with Phillip Morris, Inc., and the parties have

(continued...)

OPINION

A.  Characterization of Payments

The parties devoted a significant portion of the trial toward determining the proper characterization of the upfront cash payments which Westpac received under the purchase contracts at issue.  Petitioner contends that such payments constitute advance trade discounts; that is, the payments were made in sole consideration of Westpac's obligation to purchase the volume of goods stated in the contract.  Petitioner points to Westpac's obligation under each of the purchase contracts to repay a prorated portion of the upfront cash payments if it failed to satisfy its volume purchase commitment.[7]

---

[6](...continued)
stipulated the amounts that Westpac is required to include in income as a result of these payments.  Therefore, the figures determined by respondent in the deficiency notice do not coincide exactly with those contained in the table above.

[7]  The McCormick and GTE Sylvania contracts contained an express repayment obligation.  While the Ambassador and American Greetings contracts did not contain such an express provision, petitioner's expert witness testified that such an obligation existed implicitly pursuant to industry custom.  The existence of an implicit repayment obligation is confirmed by Westpac's dealings with the greeting card manufacturers.  Westpac terminated its contract with American Greetings prior to satisfying its volume purchase commitment.  Upon termination, Westpac issued a $406,243 check to American Greetings as a repayment of its contract advance.  Similarly, Westpac contemplated terminating its contract with Ambassador prior to satisfying its volume purchase commitment.  In the course of negotiations, Ambassador supplied Westpac with a calculation of the amount of the upfront cash payment that Westpac would be obligated to return.  Westpac never questioned its repayment
(continued...)

Respondent takes exception to petitioner's characterization of the upfront payments as constituting advance trade discounts exclusively. Respondent notes that, under each purchase contract, Westpac agreed to maintain the manufacturer as the primary or exclusive supplier of the relevant product line. In addition, under the American Greetings and GTE Sylvania contracts, Westpac agreed to maintain a specified amount of shelf space for the manufacturer's product. Respondent therefore argues that some portion of the upfront cash payments should be characterized as made in consideration of these non-volume-related commitments.

We hold that Westpac is not entitled to defer recognition of the payments as income beyond the year of receipt. We explain our decision below.

B.    Tax Treatment of Payments

Section 61 broadly defines gross income as "all income from whatever source derived". See also sec. 1.61-1(a), Income Tax Regs. In interpreting a predecessor to section 61, the Supreme Court determined that the broad statutory language evidenced congressional intent to tax all gains except those specifically exempted. See Commissioner v. Glenshaw Glass Co., 348 U.S. 426,

---

[7](...continued)
obligation. We therefore agree with petitioner that an implicit repayment obligation existed in Westpac's contracts with Ambassador and American Greetings.

430 (1955). The Court concluded that the payments in dispute in Glenshaw Glass Co. constituted gross income, describing them as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Id. at 431.

Section 451 sets forth the general rule that an item of income shall be included in the taxpayer's gross income for the taxable year in which received by the taxpayer unless, under the method of accounting used by the taxpayer in computing taxable income, such amount is to be properly accounted for in a different period. Westpac was an accrual method taxpayer. Under the accrual method of accounting, income is included in gross income when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. See sec. 1.451-1(a), Income Tax Regs. The right to receive income becomes fixed at the earliest of (1) required performance, (2) the date payment becomes due, or (3) the date payment is made. See Schlude v. Commissioner, 372 U.S. 128, 133, 137 (1963); Charles Schwab Corp. v. Commissioner, 107 T.C. 282, 292 (1996), affd. 116 F.3d 1231 (9th Cir. 1998); Cox v. Commissioner, 43 T.C. 448, 456-457 (1965).

Pursuant to the above-described principles, Westpac was required to include the advance trade discounts in income for the taxable year in which such discounts were received. Westpac had unfettered use of the cash payments in the years in which

respondent seeks to include them in income.  Accordingly, Westpac had "actual command over the property taxed--the actual benefit for which the tax is paid."  Corliss v. Bowers, 281 U.S. 376, 378 (1930).  Petitioner makes a number of arguments in favor of a contrary result which we address below.

     1.   Whether an Advance Trade Discount Can Constitute Gross Income

Petitioner contends that an advance trade discount cannot constitute an item of gross income.  Petitioner looks to the regulations promulgated under section 471 to support its argument.  Section 471 provides generally that a taxpayer is required to take inventories whenever, in the opinion of the Secretary, the use of inventories is necessary to clearly determine the taxpayer's income.  In such cases, inventory costs must be calculated at the beginning and end of each year.  See sec. 1.471-1, Income Tax Regs.  With respect to merchandise purchased over the course of the taxable year, inventory cost is defined as the invoice price less trade or other discounts.  See sec. 1.471-3(b), Income Tax Regs.  Petitioner contends that, pursuant to this last definition, trade discounts serve only as a reduction to cost of goods sold and that any discounts paid in advance of purchases cannot constitute gross income.

Petitioner reads section 1.471-3(b), Income Tax Regs., beyond its proper scope.[8]  As confirmed by a later portion of the regulation, the import of section 1.471-3(b), Income Tax Regs., is that a taxpayer's inventory cost includes only the net amount paid by the taxpayer for goods that the taxpayer has acquired: "To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods."  Sec. 1.471-3(b), Income Tax Regs. (emphasis added). Accordingly, the "discount" to which section 1.471-3(b), Income Tax Regs., refers arises contemporaneously with the purchase of specific goods as inventory and is subtracted from their invoice price to determine their cost.  The term does not include cash payments that the seller or manufacturer of goods paid to Westpac in exchange for Westpac's  agreement to purchase goods from the same vendor in the indefinite future and to not purchase competing brands from other suppliers.  Cf. Harkins v. Commissioner, T.C. Memo. 2001-100.  Based on the evidence, petitioner has failed to show that Westpac received the payments concurrently with its purchase of specific goods in inventory and that they are properly allocable as trade discounts off the

_____

[8] Petitioner's argument under this regulation is further undermined by the fact that Westpac failed to account for what it considered to be the earned portions of the advance trade discounts as reductions to its cost of goods sold on its 1990 income tax return.

invoice prices of those goods.  Accordingly, section 1.471-3(b),

Income Tax Regs., has no application to this case.

    2.    Whether Westpac's Method of Accounting Clearly Reflects
          Income

Petitioner further contends that its proposed method of

accounting for the advance trade discounts is called for by

section 1.471-2(a), Income Tax Regs.  That regulation provides as

follows:

> § 1.471-2. Valuation of inventories.--(a) Section
> 471 provides two tests to which each inventory must
> conform:

> (1) It must conform as nearly as may be to the
> best accounting practice in the trade or business, and

> (2) It must clearly reflect income.

Section 1.471-2(a), Income Tax Regs., contains two elements

stated in the conjunctive.  Petitioner has established that

Westpac's method of accounting for the advance trade discounts is

consistent with Generally Accepted Accounting Principles as well

as with the best accounting practice in the grocery store

industry.  Accordingly, petitioner has met the first requirement

of the regulation.  Petitioner, however, cannot satisfy the

regulation's second element.  Deferring the recognition of

payments actually received does not clearly reflect income,

regardless of whether the payments have been earned.  See Schlude

v. Commissioner, 372 U.S. 128 (1963); American Auto. Association

v. United States, 367 U.S. 687 (1961); Automobile Club of Mich.

v. Commissioner, 353 U.S. 180 (1957); S. Garber, Inc. v. Commissioner, 51 T.C. 733 (1969); Farrara v. Commissioner, 44 T.C. 189 (1965).

Petitioner contends that John Graf Co. v. Commissioner, 39 B.T.A. 379 (1939), requires that trade discounts not be recognized as income prior to the elimination of all contingencies to which their recognition is subject. The taxpayer in John Graf Co., a beverage retailer, instituted a lawsuit against a beer producer regarding the quality of beer that the taxpayer had previously purchased. As part of the agreement by which the parties settled the matter, the beer producer agreed to deliver to the taxpayer, free of charge, 500 cases of beer having a posted price of $1.10 per case. In addition, the manufacturer agreed to provide the taxpayer with incremental discounts totaling $2,450 on additional purchases. If the taxpayer refused to order any beer after delivery of the first 500 free cases, such failure to order would constitute a waiver of the balance of the credit allowance. Id. at 380.

During the taxable years at issue, the taxpayer's purchases entitled it to a discount of $177.50 over the $550 of free product it received. In ruling on the tax consequences of the taxpayer's settlement, the Board held that the taxpayer recognized income only to the extent of the discount which it actually received in the taxable year in issue. Id. at 385.

Noting that the taxpayer was not obligated to make additional purchases under the settlement agreement and that receipt of the total discount was not certain, the Board held that the taxpayer's income would not be accurately reflected were it required to accrue the full amount of the potential discount prior to receipt.  Id. at 384.

We find the decision in John Graf Co. v. Commissioner, supra, of little relevance to the present dispute.  The John Graf Co. case addressed the issue of whether discounts not yet received should be accrued in income;[9] it did not address the issue of whether recognition of discounts actually received subject to a contingent repayment obligation could be deferred.  As to this latter issue, it is well settled that contingent repayment obligations do not operate to defer the recognition of income:

> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * [N. Am. Oil Consol. v. Burnett, 286 U.S. 417, 424 (1932).]

---

[9]  A number of the purchase contracts at issue in the present case contained provisions for additional discounts to be paid if Westpac met certain volume purchase targets.  Unlike the Commissioner's position in John Graf Co. v. Commissioner, 39 B.T.A. 379 (1939), respondent does not contend that those future discounts should be accrued in income prior to their receipt.

C.   Disparity Between Financial and Tax Accounting

In this case, the proper method of accounting for the advance trade discounts for financial accounting purposes does not coincide with the proper tax accounting treatment of such items.  Such divergence, however, is not unprecedented.  See Frank Lyon Co. v. United States, 435 U.S. 561, 577 (1978) ("we are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same").  As explained in Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-543 (1979), financial accounting and tax accounting serve distinct objectives:

> The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled.  The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. Consistent with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets."  * * *  In view of the Treasury's markedly different goals and responsibilities, understatement of income is not destined to be its guiding light.  Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable.  [Fn. refs. omitted.]

Thus, sound justification exists for the disparate treatment of Westpac's contingent obligation to return the advance trade

discounts between the financial accounting and tax accounting regimes.

D.    Conclusion

We sustain respondent's determination that the advance trade discounts that Westpac actually received under the purchase contracts at issue constitute income in the year of receipt.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.