*Decision will be entered under Rule 50.*

PAUL H. TRAVIS AND DORIS EATON TRAVIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 108-64.    Filed February 20, 1967.

*E. James Gamble* and *Paul R. Trigg, Jr.*, for the petitioners.
*Ronald S. Supena*, for the respondent.

FORRESTER, *Judge:* Respondent determined a deficiency in the income tax of the petitioners in the amount of $244,247.51 for the taxable year ending December 31, 1958.

Some of the issues have been settled by stipulation, leaving for our consideration the following questions:

Whether the subchapter S corporation of which the petitioner Doris Eaton Travis was the sole shareholder was required to include in income amounts which became due and payable during 1958 under contracts to give dancing lessons;

Whether the corporation and/or Doris were required to include in income amounts credited to a reserve account with a finance company

during 1958, and attributable to the sale of contracts to the finance company by the corporation and by Doris' predecessor sole proprietorship;

Whether, if the two previous questions are to any extent answered in the affirmative, the corporation and/or Doris is entitled to a deduction for a reasonable addition to a reserve for bad debts;

Whether the Commissioner erred in not reducing the petitioners' income and that of the corporation by the amount of cash received by Doris as a sole proprietor and by the corporation which represented

(a) payment of contract installments that were due and payable to Doris' predecessor sole proprietorship during preceding taxable years, and

(b) amounts collected from the finance company as the result of sales of contracts to it by Doris' predecessor sole proprietorship during preceding taxable years; and

Whether the characterization of a deduction (as business or nonbusiness), which is admittedly allowable in 1958, for interest paid on prior Federal income tax deficiencies is properly before us for the year in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Paul H. Travis and Doris Eaton Travis, husband and wife, resided in Leonard, Mich. They filed a joint Federal income tax return for 1958 with the district director of internal revenue, Detroit, Mich. Paul H. Travis is a party to this proceeding only because he signed the joint return in issue, and Doris Eaton Travis is hereinafter referred to as the petitioner.

The Arthur Murray Studios of Michigan, Inc. (hereinafter referred to as the corporation), filed a United States small business corporation return of income for 1958 with the district director of internal revenue, Detroit, Mich. The corporation made a valid election under section 1372 of the Code [1] not to be subject to the taxes imposed by chapter 1, subtitle A of the Code, and the petitioner, the sole stockowner of the corporation, consented to this election.

In 1938 the petitioner and Charles R. Andrews formed Arthur Murray Dance Studios of Michigan, a partnership, which continued until 1948. Petitioner operated the business until January 31, 1958, as a sole proprietorship and under the same name. Petitioner caused the corporation to be formed in 1958 and transferred the assets of her sole proprietorship to it. She began doing business in corporate form on February 1, 1958.

---

[1] All statutory references are to the Internal Revenue Code of 1954.

At the time of incorporation the petitioner transferred to the corporation several dance studios located in Detroit and Port Huron. In the next several months the corporation acquired four more studios in the cities of Flint, Wyandotte, Kalamazoo, and Muskegon, Mich. These four studios had previously been run by subfranchised operators.

The corporation and the sole proprietorship used two types of contracts in selling dance lessons to students. One type of contract was entitled "Enrollment Agreement and Contract" and is hereinafter called a student enrollment agreement. The other type was entitled "Budget Plan" and is hereinafter called a budget plan contract.

The student enrollment agreement contained space for such information as the name, address, and telephone number of the student. It also provided for the total number of hours of dance instruction to be taken, the tuition, the amount of the deposit, and the terms for the payment of the balance of the tuition. The student was free to take the lessons at any time within a year. The contract contained the following language:

It is agreed and understood that the Arthur Murray Studios will give me the course of dance instruction indicated above within one year following the date of this agreement and that my failure to take lessons as prescribed above shall not obligate the Arthur Murray Studios to give any lessons under the terms of this agreement after this period. My failure to take lessons during the period indicated above shall not relieve me of my obligations under this contract. No delay on your part in taking action under this contract shall be deemed a waiver of any of your rights. I acknowledge that instead of the usual rate of $7.50 for each half-hour lesson a reduced rate has been granted me because of the number of lessons contracted for hereunder, and, accordingly, it is agreed that this contract may not be cancelled by me and that under no circumstances will you be required to make any refund to me.

Near the bottom of the contract in bold face, appeared the words "NON-CANCELLABLE CONTRACT."

Students frequently defaulted on these contracts, but Doris never sued them for the balance due, and the corporation followed the same policy. Frequently, Doris or the corporation would agree with a student to rewrite a contract, providing for a smaller payment and a lesser number of lessons. This was known as a "cut."

Under the terms of the student enrollment agreements in force on December 31, 1958, installment payments totaling $99,232.93 were due on or before that date.[2] Of this amount $19,971.43 represents payments falling due before the contracts were acquired by the corporation.

The budget plan contract contained spaces for information such as the name and address of the student, the name and address of his

---

[2] The statutory notice of deficiency determined this amount to be $169,919.73, but the parties are now agreed that the correct amount is $99,232.93.

employer, and his salary. The contract used the following language:

I agree to take * * * hours of dancing lessons from you during the next twelve months at a cost of $———. I hereby pay the sum of $——— on account, and agree to pay to your order the balance of $——— in ——— equal monthly installments of $——— at Educational Credit Bureau, Inc., 1111 Grand Avenue, Kansas City, Mo. The first such installment shall be paid on the ——— day of ——— 195— and subsequent installments shall be paid on the same day of each succeeding month until said amount is paid in full.

* * * I agree that this contract may not be cancelled. My failure to take lessons during the period designated above shall not relieve me of my obligations under this contract. * * *

The contract also bore the inscription in bold face, "NON-CANCELLABLE NEGOTIABLE CONTRACT." The following language appeared on the reverse side of the contract: "For value received the undersigned hereby assigns the within contract to Educational Credit Bureau, Inc."

The corporation sold these budget plan contracts to a finance company, the Educational Credit Bureau, Inc. (hereinafter referred to as ECB), of Kansas City, Mo. The sale of these contracts to ECB was governed by the terms of purchase agreements, which provided in pertinent part as follows:

1. The Buyer agrees to buy, and the Seller agrees to sell, all bona fide monthly payment installment contracts entered into between the Seller and its students, * * *

2. The Seller will send the contracts to the Buyer daily or weekly and the Buyer will purchase them for ninety percent (90%) of the face amount; fifty percent (50%) of the face amount will be remitted to the Seller immediately upon receipt of the contract, and forty percent (40%) of such face amount, hereinafter called the "Reserve," will be retained by the Buyer, and paid to the Seller when the contract has been fully paid by the student. The sum retained by the Buyer, in the amount of ten percent (10%) of the face amount constitutes payment for services rendered by the Buyer including the purchase, servicing and collection of all such contracts, and is referred to herein as a "Service Charge."

3. Upon receipt of each contract, the Buyer will send to the Seller a record card identical to one maintained by the Buyer, on which the Seller can maintain a record of payments reported by the Buyer. All payments received by the Buyer will be reported to the Seller daily, including the name of the student, amount of payment, and other pertinent information. The Reserve on fully-paid contracts will be remitted to the Seller on or before the 10th day of the month following the month of final payment.

4. The Buyer shall not be responsible for defaults in payments or in the performance of any contract by the Seller or the student. The Seller will repurchase any contract considered by the Buyer to be in default and will refund to the Buyer the unpaid balance of the total amount due under the contract, less the unearned service charge and less the contingent reserve which would have been due to the Seller if the contract had been fully paid out. On or before the 20th day of each month, the Buyer will submit a list of contracts which it considers should be repurchased by the Seller. Payment by the Seller of contracts repurchased shall be sent on or before the 10th day of the next succeeding month and no payments by the Buyer of the remainder of the purchase price

of fully-paid contracts maturing during the preceding month will be made until such refund payment is received by the Buyer. * * *

Although the terms of the purchase agreement provided that ECB would pay the corporation 50 percent of the face amount of the budget plan contract immediately upon receipt, the records of the corporation reveal that in some instances it received only 40 percent of the face amount. In all cases ECB took its 10-percent service charge. The remaining 40 or 50 percent of the face amount of the contract was accounted for by ECB in a "contingent studio reserve" and was paid to the corporation only after the student paid the full amount of his budget plan contract to ECB. The actual payment of any amount in the contingent studio reserve to the corporation was made by a bookkeeping entry to an "earned reserve" account in the corporation's name.

After a budget plan contract was sold to ECB, the student made all of his payments to it. Occasionally a student would make a payment to the corporation, but when this happened, the corporation would forward the money to ECB, treating it as a wash item on its books.

The budget plan contracts were sold to ECB with full recourse. If a student fell into default on his contract, ECB would send out a number of collection letters. When ECB determined that a given contract was uncollectible, it would notify the corporation that it was necessary for it to repurchase the contract if the student's payments totaled less than the amount of ECB's initial advance to the corporation. If the student fell into default after his total payments exceeded the amount of the initial advance, ECB credited the corporation for the difference on its books.

A repurchase of a delinquent budget plan contract would be accomplished in one of two ways. The corporation would either send a check to ECB for the amount necessary to repurchase the contract, or ECB would deduct the amount required to repurchase the contract from the earned reserve due the corporation on the 10th day of the following month. Normally the repurchase was accomplished in the second manner. In some months the amount needed to repurchase budget plan contracts was larger than the amount the corporation had earned. When this happened, ECB would apply all of the earned reserve due the corporation to the repurchase and would also, if necessary, hold back any advances on new contracts until the amount held back equaled the amount necessary to repurchase the delinquent contracts. These transactions were done on a monthly basis.

The petitioner, operating as a sole proprietorship, sold budget plan contracts to ECB under purchase agreements substantially identical to that between ECB and the corporation.

On December 31, 1958, there was $123,497.22 in the contingent studio reserve at ECB. Of this amount $110,936.89 was attributable

to budget plan contracts which had been executed by the corporation between February 1 and December 31, 1958. The remaining $12,-560.33 was attributable to budget plan contracts that had not been executed by the corporation. Of this amount $6,923.93 was attributable to contracts executed by the petitioner's sole proprietorship and $5,636.40 was attributable to contracts executed by dance studios at Flint, Wyandotte, Kalamazoo, and Muskegon.

The accounting methods of the sole proprietorship and the corporation were identical with respect to the treatment of student enrollment agreements and budget plan contracts. No accounts receivable were established when they were executed and no amounts were taken into income representing the unpaid balance at that time or as installments became due. Cash received from students and from ECB on the sale of, and collections from, contracts was credited to an account known as cash lesson receipts. No reduction was made in that account because of untaught lessons. All cash entered in that account was included in income in the year of receipt. No amount was taken into income for amounts held by ECB in the contingent studio reserve. No amount was accrued for lessons taught for which no payment had been received.

Both the corporation and the sole proprietorship accounted for expenses, including franchise fees due Arthur Murray, Inc., on an accrual basis. Since both the corporation and the sole proprietorship reported taxable income on the same method of accounting used in keeping their books, expenses were to some extent deducted for tax purposes although not paid.

In his statutory notice of deficiency the respondent determined that the entire amount due according to the terms of student enrollment agreements held by the corporation at the end of 1958 and the entire amount in the contingent studio reserve at that time were includable in the corporation's undistributed taxable income for 1958 and therefore in petitioner's taxable income for the same year.

On its return for 1958 the corporation elected to establish a reserve for bad debts and deducted an amount for a reasonable addition thereto. The election and deduction related only to bad debts expected to arise from franchise fees, audit fees, advertising and miscellaneous charges due to the corporation from subfranchised studios.[3]

The parties have stipulated that of the $79,261.50 due under student enrollment agreements at the end of 1958 and representing payment dates during the corporation's taxable year, the corporation ultimately collected only $31,159.74. The corporation agreed to reduce such pay-

[3] The corporation included subfranchise fees in income as cash was received, while the predecessor sole proprietorship accrued such fees as they became due. In the notice of deficiency the respondent determined that the corporation should have accrued additional subfranchise fees in the amount of $7,500.18. The petitioner has conceded the correctness of that determination.

ments pursuant to rewritten contracts in the amount of $31,618.22, and it determined that $16,483.54 was uncollectible. The parties have also stipulated that of the $123,497.22 in the contingent studio reserve at the end of 1958, $19,996.09 was never collected.

Both the corporation (during 1958) and the sole proprietorship during the month of January 1958 included in income all cash received. The corporation included $6,460.45 collected pursuant to student enrollment agreements under installments that had become due and payable to the sole proprietorship prior to 1958 and $29,814.45 received from ECB under budget plan contracts sold to ECB by the sole proprietorship prior to 1958. The sole proprietorship included $2,234 collected pursuant to student enrollment agreements under installments that had become due and payable to the sole proprietorship prior to 1958 and $6,718.26 received from ECB under budget plan contracts sold to ECB by the sole proprietorship prior to 1958.

The petitioner paid $12,153.30 in interest in 1958 on Federal income tax deficiencies assessed in prior years. The deficiencies arose from an increase in the distributive share of petitioner's income from the proprietorship with Andrews. Petitioner deducted $5,000 of the total amount of such interest paid as a business expense of the sole proprietorship during the month of January. In the notice of deficiency respondent determined that such amount was not deductible as a business expense of the sole proprietorship but was allowable to the petitioner as an itemized deduction. Petitioner did not deduct the balance of $7,153.30. The respondent now concedes that an itemized deduction of $12,153.30 would be proper.

OPINION

The petition states:

It was the intent of the accounting firm that prepared the financial statements and federal income tax return of the corporation to keep the books of account and to prepare the federal income tax return on the cash method of accounting. The accrual and deduction of expenses was inadvertent and erroneous.

The petitioner introduced no evidence with respect to the alleged inadvertence of the accrual and deduction of expenses. It is not clear to us how such evidence would be relevant in any event. It appears that the corporation was on the cash basis for most items of income but was on an accrual basis for all items of expense.[4] The theory of respondent's adjustments is that the accounting method used by the corporation "does not clearly reflect income." Sec. 446(b). It seems clear that an accounting system which reports income on the cash basis and expenses on an accrual basis does not clearly reflect in-

[4] Ignoring the corporation's treatment of franchise fees, as to which the petitioner has conceded the validity of respondent's adjustment, it might be fairer to say that the corporation was on an accrual basis as that method was understood under the law applicable in 1958. The petition states that the sole proprietorship was on an accrual basis.

510

come.[5]  The respondent has computed the corporation's income on an accrual basis.  There would seem to be no question but that an accrual method is one which, properly applied, "does clearly reflect income." Sec. 446(b).  The question for our decision is therefore whether the adjustments proposed by the respondent are, as he asserts, required of an accrual basis taxpayer.

At the end of 1958 the corporation held student enrollment agreements under which installments were due and payable in the amount of $99,232.93.  Of that amount, $19,971.43 represented installment payments which had become due and payable before the contracts were acquired by the corporation.  The respondent has conceded that this amount is not taxable to the corporation in 1958.[6]  Respondent argues that the balance, $79,261.50, is taxable to the petitioner as her share of the undistributed taxable income of the corporation.

*Schlude* v. *Commissioner*, 372 U.S. 128 (1963), involved a dance studio which was on an accrual basis.  It entered into contracts with students providing for installment payments at regular intervals. There, as here, the installment payments became due whether or not lessons had been given.  The respondent argued that the amount of such installments should be taken into income as they became due. The Supreme Court sustained that position, saying:

For an accrual basis taxpayer "it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income," *Spring City Co.* v. *Commissioner*, 292 U.S. 182, 184; *Commissioner* v. *Hansen*, 360 U.S. 446, and here the right to receive these installments had become fixed at least at the time they were due and payable.

The petitioner argues that under Michigan law the corporation did not have the right to receive the full amount of each installment as it became due in cases where the services called for by the contract had not been performed.  It is probably true that a Michigan court would hold the measure of damages to the corporation in a case where lessons had not been given to be the difference between the contract price and the cost of performance which the corporation was excused from rendering.  See Harris, "A Radical Restatement of the Law of Seller's Damages: Michigan Results Compared," 61 Mich. L. Rev. 849, 914 fn. 242 (1963).[7]

---

[5] Sec. 1.446–1(c)(1)(iv)(a), Income Tax Regs., states: "a taxpayer who uses an accrual method of accounting in computing business expenses shall use an accrual method in computing items affecting gross income from his trade or business."

[6] Respondent does not contend that any part of this $19,971.43 accrued, and was therefore taxable to Doris in January 1958.

[7] This is simply one application of the more general rule that contract damages are compensatory and aim to put the plaintiff in as good a position as he would have been in had the contract been performed.  Thus, where the defendant's breach excuses the plaintiff from performance, the measure of the plaintiff's damages is the difference between the contract price and the savings to him that result from the defendant's breach.  5 Williston, Contracts, secs. 1338 and 1351 (1937 ed. with 1965 cum. supp.).  Under Michigan law the burden is placed on the plaintiff to prove the cost of rendering performance on the ground that the facts are peculiarly within his knowledge.  Failing to do so, he is en-

However, the contracts in issue permitted the student to take a specified number of lessons at any time within 1 year from the date the contract was executed. Thus, the saving, if any, to the corporation from the student's failure to take lessons could not be ascertained until 1 year from the signing of the contract. Until that time the student would still be entitled to take the lessons contracted for, and the corporation, at least in the absence of an express repudiation of the contract by the student, would have a legally enforceable right to the full amount of each installment as it became due. The respondent did not include in the corporation's income the total dollar amount of payments due under student enrollment agreements during 1958. He included only amounts which were due and payable as of December 31, 1958. This did not include any amount which became due and payable during the taxable year but which the corporation determined later in the year to be uncollectible and treated as such on its books. There has been no showing that any part of the amount so included was attributable to contracts executed prior to January 1, 1958. Therefore we must assume that at the end of 1958 the corporation had a legally enforceable right to all such amounts which were due and payable on its books at that time.

The decided cases compel an accrual basis taxpayer to take into income amounts due and payable during the taxable year without regard to whether such amounts have been "earned," in a financial accounting sense, by the rendering of related services. See *Schlude* v. *Commissioner, supra,* and *E. Morris Cox,* 43 T.C. 448 (1965). It follows that respondent's determination with respect to amounts due and payable at the end of the taxable year under the student enrollment agreements must be upheld.

The respondent also included in the corporation's taxable income $123,497.22, which was the total amount in the contingent studio reserve at the end of the taxable year.

Of that amount $110,936.89 was attributable to budget plan contracts executed by the corporation between February 1 and December 31, 1958. In our view the sale of such contracts to ECB for an amount greater than that taken into income up to the time of such sale would require that an additional amount be taken into income at that time

titled to nominal damages only. *International Text-Book Co.* v. *Shulte,* 151 Mich. 149, 114 N.W. 1031 (1908) ; *International Text-Book Co.* v. *Jones,* 116 Mich. 86, 131 N.W. 98 (1911) ; *International Text-Book Co.* v. *Marvin,* 166 Mich. 660, 132 N.W. 437 (1911) ; *Walton School of Commerce* v. *Stroud,* 248 Mich. 85, 226 N.W. 883 (1929) ; *Mount Ida School for Girls* v. *Rood,* 253 Mich. 482, 235 N.W. 227 (1931). The Michigan rule is contrary to that of certain other States, some of which apparently hold that the plaintiff is entitled to the contract price without regard to the savings occasioned by the defendant's breach and some of which hold that the burden is on the defendant to show the savings that resulted to the plaintiff as a result of the breach. See "Annotations," 78 A.L.R. 334 (1932) ; 17 A.L.R. 2d 968, 974-978 (1951). See also *Green* v. *Nelson,* 120 Utah 155, 232 P. 2d 776 (1951), adopting the Michigan rule.

as gain realized on such sale. *Schlude* v. *Commissioner, supra; Shoe-maker-Nash, Inc.*, 41 B.T.A. 417, 422 (1940) ; *Baird* v. *Commissioner*, 256 F. 2d 918, 924 (C.A. 7, 1958), affirmed sub nom. *Commissioner* v. *Hansen*, 360 U.S. 446 (1959) ; *Schaeffer* v. *Commissioner*, 258 F. 2d 861, 865 (C.A. 6, 1958). Such amount includes the amounts that were here credited by ECB to the contingent studio reserve. *Schlude* v. *Commissioner, supra; Commissioner* v. *Hansen, supra; General Gas Corporation* v. *Commissioner*, 293 F. 2d 35 (C.A. 5, 1961), affirming 33 T.C. 303 (1959). Admittedly, the corporation took nothing into income with respect to the unpaid balance upon execution or as installments became due. Therefore, the corporation's taxable income from budget plan contracts executed by it must include the amount in the contingent studio reserve at the end of 1958 attributable to budget plan contracts that were executed and sold by the corporation during its taxable year.

It has been stipulated that of the total amount in the contingent studio reserve at the end of 1958, $12,560.33 was attributable to budget plan contracts that had not been executed by the corporation.

Of that amount, $5,636.40 was attributable to contracts executed by other dance studios that were acquired by the corporation during 1958. The record does not reveal whether the contracts executed by these studios were sold by them to ECB before such studios were acquired by the corporation or whether the contracts were sold by the corporation itself to ECB after the studios were acquired. The burden was on the petitioner to prove that the contracts were sold by other studios before such studios were acquired by the corporation. Having failed to do so, we must assume that the contracts were sold by the corporation. Implicit in respondent's determination with respect to this amount of $5,636.40 is a subsidiary determination that the corporation had a zero basis in the contracts. The petitioner introduced no evidence as to the corporation's basis in the contracts; however, the corporation's treatment of cash received from ECB with respect to such contracts suggests that it did have a zero basis in them. If the predecessor studios were acquired in tax-free reorganizations, the corporation would have had a carryover basis in the contracts. If the predecessor studios used the same accounting method as the corporation they would have had a zero basis in such contracts. On the record as we find it respondent's determination with respect to this amount of $5,636.40 must be upheld.

Of the amount in the contingent studio reserve attributable to budget plan contracts not executed by the corporation, $6,923.93 was attributable to contracts executed by the petitioner operating as a sole proprietor. Such contracts were sold by her to ECB before the corporation began doing business. The record does not reveal whether such sales occurred in January 1958, or prior to the taxable year in

issue. The burden of proof on this point was on the petitioner. We must therefore assume that the $6,923.93 in the contingent studio reserve was attributable to sales by petitioner during January of the taxable year.[8] The corporation and the sole proprietorship accounted for student enrollment agreements and budget plan contracts in the same manner. The sole proprietorship also accrued its expenses. The accounting method of the sole proprietorship therefore suffered from the same defect as that of the corporation. Consequently, respondent's determination with respect to the amount of $6,923.93 must be upheld for the same reasons that support his determination with respect to the amount in the contingent studio reserve attributable to budget plan contracts executed and sold by the corporation.

The petitioner makes the alternative argument that if the respondent is correct with respect to the inclusion in income of amounts due under student enrollment agreements and the amount in the contingent studio reserve, then the corporation is entitled to a deduction in 1958 for a reasonable addition to its reserve for bad debts to reflect the possibility that some portion of the amounts included in income would never in fact be collected.

The petition stated:

In its return for 1958, the first taxable year for which it was entitled to a bad debt deduction, Arthur Murray Studios of Michigan, Inc., elected under section 166, I.R.C. (1954), the reserve method for determining its deduction for bad debts.

The respondent admitted in his answer "that in its return for the taxable year ended December 31, 1958, Arthur Murray Studios of Michigan, Inc., elected the reserve method for determining its deduction for bad debts."

The parties have stipulated that the election of the reserve method by the corporation on its 1958 return and all entries on such return with respect to that election were related solely to bad debts arising from franchise fees, audit fees, advertising, and miscellaneous charges due to the corporation from subfranchised studios.

In the instant case the corporation made no election of the reserve method with respect to possible bad debts arising from either the student enrollment agreements or the budget plan contracts.

On that basis alone, respondent argues, the corporation is not entitled to a deduction in 1958 for a reasonable addition to its reserve for bad debts on account of such contracts. See secs. 1.166–1(b) and 1.166–4(c), Income Tax Regs.

We do not feel, however, that the corporation's failure properly to select the reserve method and to provide the information required by

---

[8] That this assumption is probably correct is indicated by the rate at which the corporation sold such budget plan contracts for the balance of the year.

the regulations should now bar it from asserting its right to establish such a reserve in light of the changes in accounting method proposed by the respondent.

The regulations cited by the respondent do not provide that the taxpayer must select the reserve method in a particular year or forever forfeit his right to do so. They are designed to require the disclosure of information upon which the district director may base a judgment as to whether the taxpayer is entitled to use the reserve method and as to the reasonableness of the amount claimed as a deduction as an annual addition to the reserve. Having once chosen the reserve method or the specific chargeoff method the taxpayer would be bound thereby. Cf. *Pacific National Co.* v. *Welch*, 304 U.S. 191 (1938). Here, however, there was no selection of either method *since none was required under the petitioner's assumption as to the proper method of accounting for student enrollment agreements and budget plan contracts.* Now that that assumption is proved to have been incorrect petitioner should be able to claim the benefits she would have been able to claim had she proceeded initially on the correct assumption. If she is to be penalized for having improperly reported income in 1958 there are other sections of the Code specifically designed to permit the imposition of penalties. Cf. *John P. Reaver*, 42 T.C. 72 (1964); *Mamula* v. *Commissioner*, 346 F. 2d 1016 (C.A. 9, 1965); and see Rev. Rul. 65-297, 1965-2 C.B. 152. In a case decided under the 1939 Code, the regulations under which were substantially similar to those here applicable, a distinguished panel of the Second Circuit Court of Appeals supports the correctness of the conclusion here reached. *Caldwell* v. *Commissioner*, 202 F. 2d 112 (C.A. 2, 1953). We therefore reject the respondent's contentions and disregard the corporation's failure to comply with the formal requisites of the regulations.

The parties have stipulated that of the $79,261.50 due and payable at the end of 1958 under student enrollment agreements, the corporation ultimately collected only $31,159.74. The corporation later agreed to reductions of $31,618.22 in the face amounts of contracts with students, and it determined that $16,483.54 was uncollectible. The parties have also stipulated that of the $123,497.22 in the contingent studio reserve at the end of 1958, $19,996.09 was never collected.

With respect to amounts that were not collected because the corporation agreed with students to rewrite student enrollment agreements previously executed, we are of the view that there is insufficient evidence in the record to show that the debts established by the original contracts became worthless to the extent of the amount by which they were reduced, or to any extent. It follows that there is no basis for

deducting such amount as a reasonable addition to a reserve for bad debts.[9]

With respect to amounts that the corporation determined to be uncollectible, we are convinced by petitioner's evidence relating to the process by which the corporation made such determinations that these amounts can properly be said to be attributable to debts that became worthless. Considering this and all of the other record evidence of the facts existing at the close of 1958, we are of the view that the petitioner has proved that the corporation is entitled to a deduction in 1958 in the amount of $16,483.54 as a reasonable addition to a reserve for bad debts.

The corporation's position with respect to the amount in the contingent studio reserve at the end of 1958 was that of a guarantor rather than a creditor.

Pub. L. 89–722, 89th Cong., 2d Sess., added a new section 166(g). Applicable to taxable years ended after October 21, 1965, it provides:

(g) RESERVE FOR CERTAIN GUARANTEED DEBT OBLIGATIONS.—

(1) ALLOWANCE OF DEDUCTION.—In the case of a taxpayer who is a *dealer in property,* in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction—

(A) for a reasonable addition to a reserve for bad debts which may arise out of his liabilty as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of *real property or tangible personal property* (including related services) in the ordinary course of his trade or business; * * *
[Emphasis added.]

Section 2(b) of Pub. L. 89–722 provides:

(b) If—

(1) the taxpayer before October 22, 1965, claimed a deduction, for a taxable year ending before such date, under section 166(c) of the Internal Revenue Code of 1954 for an addition to a reserve for bad debts on account of debt obligations described in section 166(g)(1)(A) of such Code (as amended by the first section of this Act), and

(2) the assessment of a deficiency of the tax imposed by chapter 1 of such Code for such taxable year and each subsequent taxable year ending before October 22, 1965, is not prevented on December 31, 1966, by the operation of any law or rule of law, then such deduction on account of such debt obligations shall be allowed for each such taxable year under such section 166(c) to the extent that the deduction would have been allowable under the provisions of such section 166(g)(1)(A) if such provisions applied to such taxable years.

Section 2(b) is of no help to the corporation. Again ignoring its failure to comply with the formal requisites of the regulations under section 166(c), the corporation is still entitled to no benefit because (if

---

[9] Petitioner might have argued that this $31,618.22 was deductible in 1958 as an addition to a reserve for estimated losses on rewritten contracts. She did not do so, however, and the record is silent with respect to the precision with which the corporation was able to estimate the amount of such losses in advance. We have therefore not passed upon the question whether the establishment of such a reserve in 1958 would have been proper. Cf. *Simplified Tax Records, Inc.,* 41 T.C. 75 (1963).

for no other reason) it was a seller of services. The new section applies only to "a taxpayer who is a dealer in property" and to "obligations arising out of the sale by him of real property or tangible personal property (including related services)." Sec. 166(g)(1)(A). The report of the Committee on Ways and Means of the House of Representatives evidences a deliberate intention to exclude sellers of services from the benefit of the new section. The report, H. Rept. No. 2157 (to accompany H.R. 11782), 89th Cong., 2d Sess., states at page 6:

> The deduction is only allowed to a dealer in property with respect to obligations which arise out of the sale by him of real or tangible personal property (including related services) in the ordinary course of his trade or business. Related services include only those services which are incidental to the sale of the real or tangible personal property, the charges for which are additions to the sales price of the property. Thus, if a dealer who sells television sets charges an additional amount for delivery, the delivery is considered a related service. Also, if at the time of the sale the dealer, for an additional charge, provides a 3-year repair service contract and includes such charge in the sales price, such repair service contract is a related service. However, if such dealer does not sell the repair service contract contemporaneously with the sale of the television set or the service contract includes television sets in addition to the one sold by the dealer, such service contract is not a related service.

Section 166(g)(2) provides:

> (2) DEDUCTION DISALLOWED IN OTHER CASES.—Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations.

The report of the Committee on Ways and Means states at page 5:

> The bill provides that the new reserve previously described is to be the only reserve through which a deduction is to be allowed for any addition to a reserve for bad debts which arises out of the taxpayer's liability as a guarantor, endorser, or indemnitor of debt obligations. For example, if the taxpayer has an account receivable from a customer simply for services rendered (not in connection with a sale of property) the bill provides that no deduction is to be allowed for an addition to a reserve for liabilities arising out of the sale with recourse of such a debt obligation.

Section 2(c) of Pub. L. 89-722 provides:

> (c) Section 166(g)(2) of the Internal Revenue Code of 1954 (as amended by the first section of this Act) shall apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954.

In light of the clearly expressed congressional purpose to apply section 166(g)(2) to all years covered by the 1954 Code [10] we must hold that the corporation, not being a "dealer in property," is not entitled to an addition to a reserve for bad debts in 1958 with respect to amounts in the contingent studio reserve at the end of that year.

---

[10] It is clear that the Congress had power to make the new sec. 166(g) retroactive. *Estate of Harris Fahnestock,* 2 T.C. 756 (1943).

Finally, petitioner argues that the corporation should be permitted deductions under section 166 (a) with respect to accounts which, under respondent's theory, accrued to the sole proprietorship prior to 1958 but were determined to be uncollectible in 1958. Since these amounts had not previously been included in income by the sole proprietorship such deductions are not allowable. Sec. 1.166–1 (e), Income Tax Regs.

The corporation included in income all of the cash it received during the year in issue. This included $6,460.45 collected by it pursuant to student enrollment agreements under installments that had become due and payable to the sole proprietorship prior to 1958. It also included $29,814.45 collected by the corporation in 1958 from ECB under budget plan contracts sold to ECB by the sole proprietorship prior to 1958. The petitioner included in her income all of the cash she received while operating as a sole proprietorship during the month of January. This included $2,234 collected pursuant to student enrollment agreements under installments that had become due and payable prior to 1958, and $6,718.26 received from ECB under budget plan contracts sold to ECB by the sole proprietorship prior to 1958.

The petitioner argues that consistency requires the respondent to recognize that the above amounts were properly taxable to her in years prior to 1958 and therefore cannot properly be includable in her income for 1958. The cases support her position. *Heer-Andres Investment Co.*, 17 T.C. 786 (1951), and cases cited therein; *E. Morris Cox*, *supra* at 458–460. It follows that the petitioner's taxable income for 1958 must be decreased by $45,227.16.

The respondent might have sought to avoid this result by making adjustments of the type permitted by section 481, but he did not do so. Petitioner argues on brief that the mere fact that respondent's adjustments resulted from a change in accounting method entitled her, under section 481(a) (2), to reduce those adjustments by the amount of accounts outstanding on January 1, 1954. The "except" clause in section 481(a) (2) comes into operation, however, only in the event that certain "adjustments" are made. They are "those adjustments which are determined to be necessary solely by reason of the change [in accounting method] in order to permit amounts from being duplicated or omitted." See sec. 481(a) (2). Respondent has not made any such adjustments in the instant case. Therefore petitioner can reap no benefit from section 481 (a) (2).

In his reply brief, the Commissioner responds to the petitioner's argument based on section 481(a) (2) by taking the position that section 481 does not apply in the instant case because the corporation was

not the same taxpayer as the sole proprietorship and therefore had no "preceding taxable year" within the meaning of section 481(a)(1). Thus, the Commissioner put himself in the anomalous position of arguing that a provision that would have aided him, if it applied, did not apply. Since the respondent did not rely on section 481 we do not reach the question whether it would be applicable in the instant case. Cf. *E. Morris Cox, supra.*

It should be noted, however, that we have treated this aspect of the case as though the petitioner and the corporation, which elected subchapter S treatment for the year in issue, were the same taxable entity. This was the approach taken in *E. Morris Cox, supra,* and seems sound in light of the purposes of subchapter S. If the corporation had not elected subchapter S treatment, the cash received by it with respect to accounts transferred to it by the sole proprietorship would have been includable in its income for 1958. This is because the accounts were transferred from the sole proprietorship in a tax-free exchange. The corporation therefore had the same basis in them as the sole proprietorship, which had a basis of zero. Therefore, if the corporation were a separate taxable entity it would have been required to take into income all cash received with respect to such accounts. *P. A. Birren & Son* v. *Commissioner,* 116 F. 2d 718 (C.A. 7, 1940), and cf. *Ezo Products Co.,* 37 T.C. 385 (1961).

During its taxable year, February 1, 1958, to December 31, 1958, the corporation made no distribution of dividends. Accordingly, the taxable income of the corporation constitutes undistributed taxable income and is includable in its entirety in the gross income of petitioner for 1958. Secs. 1372 and 1373.

The parties are now agreed that the amount of $12,153.30, representing interest paid in 1958 on prior Federal income tax deficiencies, is allowable to petitioner as a deduction. Petitioner asks us to label this as a "business deduction" within the intendment of section 172(d)(4) for carryback and carryover purposes. It is apparent, however, that such label will have relevance only when a net operating loss for 1958, if any, is sought to be carried back or forward to a year other than 1958, the only year here in issue. Therefore, the question whether the interest payments in the instant case are business or nonbusiness deductions within the meaning of section 172(d)(4) is not before us.

*Decision will be entered under Rule 50.*