LYNN L. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 1449-79.
United States Tax Court
T.C. Memo 1983-472; 1983 Tax Ct. Memo LEXIS 319; 46 T.C.M. (CCH) 1039; T.C.M. (RIA) 83472; August 11, 1983. *319 In 1974 and 1975, P was a dealer in used cars, and many of the sales were made on credit. P held the notes and reported the payments thereon as income when he received them. Held, P must report the income from the sale of cars by the accrual method and must report the face amount of the notes as income when received. Held, further, P is entitled to deductions for reasonable additions to a reserve for bad debts. Sec. 166, I.R.C. 1954. J. Frank Thompson, for the petitioner. Gary A. Benford, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Year
Deficiency
1974
$23,254.88
1975
11,557.27
After concessions by both parties, the issues for decision are: (1) Whether the petitioner must use the accrual method of accounting to reflect the income from the purchase and sale of cars in his used car business; and (2) whether the petitioner is entitled to deductions for reasonable additions to a reserve for bad debts. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Lynn L. Smith, resided in Colleyville, Tex., at *320 the time he filed his petition in this case. He filed his Federal income tax returns for 1974 and 1975 with the Internal Revenue Service. In 1974 and 1975, the petitioner was a used car dealer. He has operated as a sole proprietorship since 1972 and filed his returns for 1975 and 1973 using the same method of accounting as he used to file his 1974 and 1975 returns. The petitioner sold cars to individuals some of whom were not good credit risks. As a result, he held the notes of customers who wished to purchase cars on credit and was known in the industry as a "note-toter." In 1974, he sold 358 cars and financed 188 of these sales. The total sales prices for cars sold in 1974, exclusive of interest charges, was $332,605.37. In 1975, the petitioner sold 379 cars and financed 278 of these sales. The total sales prices for cars sold in 1975, exclusive of interest charges, was $446,966.60. Prior to extending credit to a customer, the petitioner obtained from him an application for credit. The application form provided space for such information as the customer's name and address, the length of time at such address, employer's name, credit references, and the names of two or more *321 relatives or friends. In deciding whether to extend credit to an applicant, the petitioner was concerned primarily with where the applicant lived, where he worked, and who were his friends. Most of the petitioner's customers furnished him with the names of businesses from whom they had received credit. On occasion, the petitioner verified such information, but he never refused a customer because of his failure to pay other obligations. When the petitioner extended financing to a customer, the customer signed a motor vehicle contract/promissory note. Some of the contracts provided for the payment of interest, and most of the contracts required the customer to make weekly payments on the note. In the event a customer defaulted, the petitioner had a right under the contract to repossess the automobile. When a customer defaulted, it was the petitioner's practice to contact the customer and to attempt to arrange for payment of the note, but if no arrangements could be made, the petitioner hired individuals known in the industry as "repo men," who repossessed the automobile for a fee. The petitioner repossessed 69 cars in 1974 and 107 cars in 1975. After a car was repossessed, the *322 petitioner notified the customer of the repossession and gave him 5 or 10 days to reach an agreement with respect to payment for the car. If no agreement was reached, the petitioner resold the car and made no other attempt to collect the note. In some cases, the petitioner even agreed to sell another car to a customer whose car was repossessed without requiring him to pay the balance outstanding on his note. The petitioner made no accounting entries to reflect a default on a note and the repossession of a car. The petitioner's business records consisted of only a check register, bank statements, cancelled checks, records of his cash expenditures, and an individual "envelope" for each car held by him. Such envelopes contained spaces for such information as the model number of the car, the purchaser, the date of purchase, the date sold, the cost, the expenses, the selling price, and the profit on the sale. In addition, there was space on the envelope for describing the repairs made on the car. Notes given for the purchase of used cars, such as those received by the petitioner, typically sold for between 20 and 30 percent of their face value. The petitioner did not attempt to *323 sell any of his notes. However, on one occasion, he attempted to use such notes as collateral at a bank, but the bank refused to accept them. The petitioner purchased 60 percent of his inventory from wholesale car dealers, 35 percent from retail car dealers, and 5 percent from individuals. He used bank drafts to purchase all of the cars from the dealers and some of the cars from the individuals. When the petitioner purchased a used car with a bank draft, he issued the seller a draft payable by a named payor (either a bank or an individual). The seller of the car took the draft, together with the title to the car which he had just sold, to a designated bank. The draft was paid by the named payor, who then held title to the car. When the petitioner sold the car, he wrote a check to the named payor of the draft and received the title to the car. If the petitioner financed the sale, he held title to the car until the note was paid; otherwise, he passed title to the buyer. The petitioner maintained inventories during 1974 and 1975. Such inventories amounted to zero on January 1, 1974, $16,275 on December 31, 1974, and $14,700 on December 31, 1975. Each year, the petitioner determined *324 his purchases by adding together all of the checks he wrote to the named payors of the drafts and to the individuals from whom he purchased cars. Such purchases amounted to $190,065 for 1974 and $257,925 for 1975. During the years in issue, the petitioner withdrew cash from his business for personal purposes. No records were kept of such withdrawals, but he estimated their amount to be between $700 and $1,000 per month. In 1974, the petitioner had net credit sales [1] of $147,349.40 and net repossession losses [2] of $26,661.41. In 1975, the petitioner had net credit sales of $249,608.40. On his individual Federal income tax returns, the petitioner reported gross receipts from his business of $241,009 for 1974 and $388,328 for 1975. He determined his gross receipts *325 for such years by reference to total bank deposits. In computing gross receipts, he did not consider, and assigned no value to, the promissory notes that he received as a note-toter. In addition, the gross receipts reported by him did not reflect any amounts withdrawn for personal purposes. In his notice of deficiency, the Commissioner determined that the petitioner's method of accounting did not clearly reflect income and that the income from the sale of used cars had to be reported on the accrual method. Accordingly, he recomputed the petitioner's income from sales by using the accrual method, took into consideration the face amount of the notes when received, and made other appropriate adjustments to reflect the change of accounting method. The Commissioner further determined that the petitioner sustained specific bad debt losses on the repossession of automobiles and was entitled to deductions for such losses in the amounts of $20,924.50 for 1974 and $41,993.59 for 1975. At trial, the Commissioner conceded that the petitioner was entitled to additional deductions of $12,069.02 for 1974 and $27,833.00 for 1975. Such concession was based on the fact that the fair market value *326 of each repossessed car was not used subsequently by the Commissioner to increase the petitioner's cost of goods sold. OPINION The first issue for decision is whether the petitioner must use the accrual method of accounting to report his income from the purchase and sale of automobiles in his used car business. He argues that the cash method clearly reflected his income and that he has consistently used such method. Section 446(a) of the Internal Revenue Code of 1954[3] states the general rule for methods of accounting. Such section provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, section 446(b) provides that "If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." (emphasis added). It is well established that section 446(b) vests the Commissioner with broad authority in matters of inventory accounting and gives him wide latitude to recompute income so as clearly *327 to reflect income. See Thor Power Tool Co. v. Commissioner,439 U.S. 522, 532 (1979); Commissioner v. Hansen,360 U.S. 446, 467 (1959); Superior Coach of Florida v. Commissioner,80 T.C. 895 (1983); H. Dubroff, M. Cahill, and M. Norris, "Tax Accounting: The Relationship of Clear Reflection of Income to Generally Accepted Accounting Principles," 47 Albany L. Rev. 354, 363-366 (Winter 1983). The purchase and sale of automobiles was the principal income-producing factor in the petitioner's business. In all cases where the purchase or sale of merchandise of any kind is a principal income-producing factor, the use of inventories is required. See secs. 1.446-1(a)(4)(i), 1.471-1, Income Tax Regs.; Wilkinson-Beane, Inc. v. Commissioner,420 F. 2d 352, 354 (1st Cir. 1970), affg. a Memorandum Opinion of this Court; Ezo Products v. Commissioner,37 T.C. 385, 392 (1961). The petitioner maintained inventories at the beginning and end of each year for the cars that he purchased and sold in his business and does not dispute his obligation to keep inventories. In cases in which it is necessary *328 to use an inventory, the accrual method of accounting must be used with regard to purchases and sales unless otherwise authorized by the Commissioner. See sec. 1.446-1(c)(2), Income Tax Regs. The use of the accrual method of accounting has been consistently upheld by the courts in similar cases. [4] See Record Wide Distributors, Inc. v. Commissioner,682 F. 2d 204 (8th Cir. 1982), affg. a Memorandum Opinion of this Court; Iverson's Estate v. Commissioner,255 F. 2d 1, 5 (8th Cir. 1958), affg. 27 T.C. 786 (1957); Caldwell v. Commissioner,202 F. 2d 112, 114 (2d Cir. 1953), affg. on this issue a Memorandum Opinion of this Court; Herberger v. Commissioner,195 F. 2d 293 (9th Cir. 1952), affg. a Memorandum Opinion of this Court; Ezo Products v. Commissioner,37 T.C. at 392. [5] One of the purposes of accounting is to properly match income with the expenses of producing such income. See Eastman Kodak Co. v. United States,209 Ct. Cl. 365, 534 F. 2d 252 (1976); Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1333-1334 (1971), affd. without published opinion 496 F. 2d 876 (5th Cir. 1974). If the petitioner acquired and sold a car in 1974, its cost was reflected in that year, but if the *329 income from the sale was not reported until received, the income may not have been reported until 1975. The same potential for mismatching would result from cars sold in 1975 but not paid for until 1976. Such a result is inconsistent with the objectives of sound accounting. In Caldwell v. Commissioner,supra, the court wrote: The use of inventories in computing income results in stating the expenses of a year's operations in terms of the cost of the goods actually sold during that year. Thus, the profit from these operations will be stated accurately only if the income from all sales made during the year is taken into consideration. *330 This requires use of the accrual method of determining income, since the cash receipts method obviously does not reflect the actual sales made during the year where * * * a substantial part of these sales * * * is made on credit. [202 F. 2d at 114; emphasis added.] The purchase and sale of cars was a principal, if not the sole, income-producing activity of the petitioner, and consequently, his failure to match properly the income and expenses of such activity materially distorted his income. Hence, we conclude that the petitioner's business was of such a nature that a cash receipts and disbursements method of accounting for the purchase and sale of cars did not clearly reflect income and that such income must be determined on an accrual method of accounting. See Record Wide Distributors, Inc. v. Commissioner,supra;Caldwell v. Commissioner,supra.
The petitioner argues that the accrual method of accounting does not clearly reflect his income since he received notes from individuals who were poor credit risks. He maintains that such notes had little market value and that a large portion of such notes were never collected. However, under the accrual method, it is the right to *331 receive, and not the actual receipt of, income that determines the inclusion of an amount in gross income. Spring City Foundry Co. v. Commissioner,292 U.S. 182, 184-185 (1934); see also Helvering v. Enright,312 U.S. 636 (1941). When the right to receive an amount becomes fixed, the right accrues. While the courts have recognized an exception under which a taxpayer is not required to accrue income where such income is of doubtful collectibility (see, e.g., Harmont Plaza, Inc. v. Commissioner,549 F. 2d 414 (6th Cir. 1977), affg. 64 T.C. 632, 649 (1975)), and the courts have construed such exception quite narrowly. See Georgia School-Book Depository, Inc. v. Commissioner,1 T.C. 463, 469 (1943); see also Jones Lumber Co. v. Commissioner,404 F. 2d 764 (6th Cir. 1968), affg. a Memorandum Opinion of this Court.The mere possibility of a default on an obligation is insufficient to defer accrual of such note. See Spring City Foundry Co. v. Commissioner,supra;FirstSavings & Loan Association v. Commissioner,40 T.C. 474, 487 (1963). Such reasonable doubt as to the collectibility must be established as of the time the right to the income arises. Spring City Foundry Co. v. Commissioner,supra; *332 Jones Lumber Co. v. Commissioner,404 F. 2d at 766. The execution of the notes in this case fixed the petitioner's right to receive the face amount of such notes, and, under the accrual method, he is required to take into income the face amount of such notes. See Spring City Foundry Co. v. Commissioner,supra; see also Jones Lumber Co. v. Commissioner,supra;First Savings & Loan Association v. Commissioner,supra; George L. Castner Co. v. Commissioner,30 T.C. 1061 (1958). Many of the customers may have been poor risks, but the petitioner has wholly failed to establish that any of the notes were of doubtful collectibility at the time he received them. We conclude that the Commissioner properly accrued into income all of the notes received by the petitioner. Accordingly, we sustain the Commissioner's determination on this issue. In the alternative, the petitioner contends that if he is required to use the accrual method, he is entitled to deduct a reasonable addition to a reserve for bad debts. Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year." Section 166(c) provides that "in lieu of any deduction under subsection (a), there shall *333 be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts." A reserve for bad debts constitutes an estimate of those losses which can reasonably be expected to result from current business debts. Handelman v. Commissioner,36 T.C. 560, 566 (1961); see also Ehlen v. United States,163 Ct. Cl. 35, 323 F. 2d 535 (1963). While the reasonableness of an addition to the reserve ordinarily will be judged in light of a taxpayer's experience in collecting its accounts, no hard and fast standard should be adopted. In the final analysis, an estimate as to the reserve required for any given year will be measured in light of the conditions existing at the time the estimate is made. Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), affd. 125 F. 2d 977 (6th Cir. 1942). The petitioner argues that he should be entitled to set up a reserve for bad debts based upon the percentage of the cars he repossessed each year. The Commissioner has taken the position that he allowed the petitioner a deduction for specific bad debts, that the petitioner did not elect to claim a reasonable addition to a reserve for bad debts in lieu of a specific bad *334 debt deduction, and that the petitioner had not adequately established what was a reasonable addition to a reserve for bad debts for each year. The Commissioner points out that in the typical situation, the issue of what constitutes a reasonable addition to a reserve for bad debts arises where the taxpayer claims an addition to a reserve on his income tax return and where the Commissioner challenges such claimed addition. Under such circumstances, the taxpayer bears the burden of showing that his claimed addition was reasonable and that the Commissioner's adjustment constituted an abuse of discretion. See Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. 735 (1963). However, in Travis v. Commissioner,47 T.C. 502 (1967), affd. on this issue 406 F. 2d 987 (6th Cir. 1969), the Court was faced with a situation similar to the present case. There, the taxpayer had improperly accounted for certain contract income by including in income only the payments actually received on such contracts. We held that the taxpayer had to accrue into income all amounts which were due and payable under the contracts. The taxpayer asserted that if we sustained the Commissioner on the inclusion *335 issue, then it was entitled to a deduction for a reasonable addition to a bad debt reserve. We said: We do not feel, however, that the corporation's failure properly to select the reserve method and to provide the information required by the regulations should now bar it from asserting its right to establish such a reserve in light of the changes in accounting method proposed by the respondent. The regulations cited by the respondent do not provide that the taxpayer must select the reserve method in a particular year or forever forfeit his right to do so. * * * Here * * * there was no selection of either method since none was required under the petitioner's assumption as to the proper method of accounting for student enrollment agreements and budget plan contracts. Now that that assumption is proved to have been incorrect petitioner should be able to claim the benefits she would have been able to claim has she proceeded initially on the correct assumption. * * * [47 T.C. at 513-514; emphasis in original.] Thus, where the Commissioner changes the taxpayer from the cash to the accrual method of accounting, a taxpayer may be entitled to adopt the reserve method. Caldwell v. Commissioner,supra; *336 Travis v. Commissioner,47 T.C. at 514. Under the cash method, the petitioner was not entitled to any deduction for bad debts, since he did not take any of the notes into income. However, upon changing over to the accrual method of accounting, he may, for the first time, claim either specific bad debt deductions on the notes or elect the reserve method. We agree with the petitioner that he is entitled to deduct reasonable additions to a bad debt reserve; but we do not agree with the formula used by him to determine the amount of such additions. Under the petitioner's method, he subtracted his cash sales from total sales to arrive at credit sales. Thereafter, he multiplied the credit sales by a fraction consisting of the number of repossessions over the number of credit sales. Under his method, the petitioner failed to account for any amounts that he received on the notes prior to the repossession of the automobile. In addition, he ignored the value of the cars repossessed. The record is scanty, but from the available information, we have found the amounts of the petitioner's net credit sales for 1974 and 1975 and the amount of his net repossession losses for 1974. In computing *337 a reasonable addition to a bad debt reserve, the courts have repeatedly sustained a computation based upon a percentage of a taxpayer's annual sales. See, e.g., Shield Co. v. Commissioner,2 T.C. 763 (1943); Medical Diagnostic Association v. Commissioner,42 B.T.A. 610 (1940); Proctor Shop, Inc. v. Commissioner,30 B.T.A. 721 (1934), affd. 82 F. 2d 792 (9th Cir. 1936); Home Ice Cream & Ice Co. v. Commissioner,19 B.T.A. 762 (1930); Transatlantic Clock & Watch Co. v. Commissioner,3 B.T.A. 1064 (1926). [6] For 1974, the petitioner's net repossession losses represented 18 percent of his net credit sales, and such percentage appears to constitute a reasonable basis for computing an addition to a reserve for bad debts. Consequently, we hold that he is entitled to a deduction for an addition to a reserve for bad debts computed by applying such percentage to his net credit sales for 1974 and 1975. The petitioner is also entitled to additional deductions in accordance with the Commissioner's concession with respect to the basis in the repossessed automobiles. Decision will *338 be entered under Rule 155.
Footnotes
1. The amount of a net credit sale was calculated by taking the gross sales price and subtracting therefrom the cash downpayment and trade-in. Thus, it represented the portion of a credit sale which was "at risk." ↩
2. A net repossession loss was calculated by taking the sales price and subtracting therefrom the downpayment and other payments received on the note and the value of the repossessed car at the time of repossession.↩
3. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
4. On the other hand, where inventories are so small as to be of no consequence or consist primarily of labor, the courts have recognized that the presence of inventories may not require a change in a taxpayer's method of accounting. See Wilkinson-Beane, Inc. v. Commissioner,420 F. 2d 352, 355 n. 9 (1st Cir. 1970), affg. a Memorandum Opinion of this Court; Ezo Products v. Commissioner,37 T.C. 385, 392 (1961); Drazen v. Commissioner,34 T.C. 1070, 1079↩ (1960). However, we do not have such a case before us. 5. See also Moore v. Commissioner,T.C. Memo. 1983-39↩.
6. See also Carp v. Commissioner,T.C. Memo. 1961-340; Funkhouser Industries, Inc. v. Commissioner,T.C. Memo. 1957-197↩.