JERRY C. MOORE AND BILLIE F. MOORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moore v. Commissioner
Docket No. 8729-78
United States Tax Court
T.C. Memo 1983-39; 1983 Tax Ct. Memo LEXIS 743; 45 T.C.M. (CCH) 557; T.C.M. (RIA) 83039; January 24, 1983. Alfred Sallinger,John D. Copeland and PauletteMueller, for the petitioners. Gary A. Benford, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in income tax of petitioners, Jerry C. Moore and Billie F. Moore, for the calendar years 1972 and 1973 in the respective amounts of $281,917 and $116,833. The issues for *745 decision are as follows: (1) whether respondent properly determined under section 446(b)[1] that petitioners should use an accrual method of accounting rather than the cash method of accounting to reflect the purchases and sales of cars in their used car business, and (2) assuming that petitioners are required to use an accrual method of accounting, are petitioners entitled to deductions for reasonable additions to a reserve for bad debts under section 166(c). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Jerry C. Moore and Billie F. Moore, *746 husband and wife, resided in Dallas, Texas, at the time of the filing of their petition herein. Petitioners filed joint Federal individual income tax returns for the taxable years 1972 and 1973 with the Office of the Internal Revenue Service in Austin, Texas. Mr. Moore together with Mrs. Moore operates, as a sole proprietorship, a used car sales business in Dallas, Texas, known as ABC Motors. Petitioners have been involved in the operation of ABC Motors continuously since 1968. Up until September 1969, Mr. Moore operated ABC Motors in partnership with another individual. Mr. Moore, as of the date of the trial, had been involved in the car sales business for approximately 25 years. Prior to operating ABC Motors, Mr. Moore had been employed with other car dealers in various capacities as a salesman, assistant manager and used car manager. Most of ABC Motors' customers are persons who are in the low income group. Its customers typically would not be able to either qualify for or obtain bank financing. ABC Motors financed virtually all of the purchases of used cars from its lot by its retail customers. ABC Motors' operation is what is commonly known in the car business as *747 a "note car lot." ABC Motors, in its operations, would often extend credit to persons who would not be extended credit by other "note car dealers" in the Dallas area. In his operation of ABC Motors, Mr. Moore was willing to handle higher risk accounts and to take smaller downpayments than most used car dealers. As a result, the prices at which cars were sold were substantially higher than if the cars had been sold for cash. Mr. Moore usually marked up the fresh cars he purchased to sell for an amount 2-1/2 to 3 times the amount for which he himself had purchased them. Prior to making a sale to a prospective customer, ABC Motors requires the individual to fill out a credit application. In obtaining the information contained in the application, ABC Motors was primarily interested in ascertaining where the individual might be located in the event he failed to make a payment or if the car had to be repossessed. ABC Motors does not check out a customer's credit rating with the local credit bureau. The promissory note which a customer executes pursuant to his motor vehicle contract provides for the payment of the balance of the purchase price in installments. Installments on *748 the notes that ABC Motors took generally had to be made weekly, but in some cases, installments were allowed to be made every other week or semimonthly, and in rare cases, installments were allowed to be made monthly. The payment days, as well as the frequency of the installments, were made to coincide with the particular customer's payday. ABC Motors, as a part of its business, also offered a check cashing service. The notes which ABC Motors took back, if paid according to their terms, would usually be paid in six months or less. During the years here in issue, no interest was charged on the balances owed on the notes. Payment on the notes was secured by the automobile sold. ABC Motors under a motor vehicle contract retained a security interest in the automobile. Under such contract, ABC Motors retained the right to repossess the automobile in the case of a default in payments. The notes or dealer paper which ABC Motors obtains in the course of its business are not of the quality which a bank would be interested in purchasing, except perhaps for some very nominal amount representing a fraction of the face amount of the notes. The office staff at ABC Motors devoted the *749 majority of their time to collection work. Of the employees working in its office, only one of them devoted her time to keeping the books and records and doing paperwork. The rest of the office staff were involved in collections or repossessions. If a customer did not make payment of an installment when it was due, especially if the installment was his first, ABC Motors would attempt to contact him within a day or two. If the employee contacting the customer was satisfied with the reason given for missing the payment, the customer might be allowed several days to make the payment. If the employee was not satisfied or was unable to contact the customer, ABC Motors would then seek to repossess the automobile. Its employees, based on the information the customer had given on his credit application, would seek to find the car. The first places where these employees would look for the automobile would be at the customer's residence or at his place of employment. In instances where a customer had defaulted, it was not worth the time and expense to obtain a judgment against him. As a result, when a default occurred ABC Motors concerned itself with either seeking to persuade the *750 customer to resume payments or repossessing the car. ABC Motors maintained a separate file referred to as a "skip file." The accounts placed in this file were transactions in which a customer had failed to pay off his note and had disappeared with the car so that the car had not been returned or repossessed. ABC Motors had as a practical matter given up on repossession of the car when a note was placed in the "skip file." Petitioners utilize inventories at the beginning and end of each taxable year to reflect the cars they have sold and purchased in the course of conducting their used car business for purposes of determining their cost of goods sold. Petitioners reflected the income derived and the other expenses incurred from their used car business on the cash method of accounting. Petitioners reported for the years 1971, 1972 and 1973, gross receipts from the sale of autos of $499,158, $631,984 and $908,072, respectively, prior to reduction for cost of goods sold. It was petitioners' business practice to deposit all payments received in their used car business in a bank account. Petitioners, on their income tax returns for the years 1972 and 1973, reported the total deposits *751 made to this account in each year as the gross receipts from their used car business. No value was assigned to the promissory notes received by ABC Motors, nor were the notes taken into consideration in computing gross receipts. In 1972, petitioners, in the conduct of their used car business, entered into 1,909 transactions involving the sale of a car. These transactions included 1,690 retail sales involving the creation of a note and 219 sales for cash. The 219 cash transactions, when aggregated, totaled $12,295.86, for an average of $56.15 per cash sale. Many of the cash sales were sales for salvage. The 1,909 sales transactions taking place in 1972 involved the sale of only 1,242 different cars because many cars were repossessed and sold more than once.The following table shows the number of cars sold, the number of times sold, and the total number of transactions in 1972: No. of Cars
No. of Times
No. of
Sold
Sold
Transactions
787
1 time
787
292
2 times
584
125
3 times
375
29
4 times
116
7
5 times
35
2
6 times
12
Totals 1,242
1,909
Of the 1,690 notes created in 1972, 348 were ultimately paid in full and 1,342 were defaulted *752 by the customer with ABC receiving less cash than the face amount of the note. Of the 348 notes paid in full, in cash, 158 were fully paid in 1972 and 190 in 1973. Of the notes created in 1972, 20.6 percent were ultimately paid in full, in cash. Thus, of the notes created in 1972, 79.4 percent were defaulted upon. The 1,909 sales in 1972 resulted in the creation of notes having an aggregate face value of $1,382,058. The total of the unpaid balances due on all notes receivable by ABC Motors (total Accounts Receivable) at the end of the taxable years 1971, 1972 and 1973, is as follows: Date
Amount
December 31, 1971
$348,261
December 31, 1972
$476,940
December 31, 1973
$644,571
These notes receivable amounts were compiled by the revenue agent who conducted the examination of petitioners' returns. The notes included in these amounts were notes which on the applicable dates had not been paid in full and where the car had not been repossessed. Of the $348,261 of notes receivable as of December 31, 1971, $7,376 were again included in notes receivable as of December 31, 1972. Of the $476,940 of notes receivable as of December 31, 1972, $26,272 were again *753 included in notes receivable as of December 31, 1973. No portion of the notes receivable as of December 31, 1971, were included in notes receivable as of December 31, 1973. With respect to the notes receivable as of December 31, 1971, $116,787 of collections were made during 1972 and another $2,018 of collections were made during 1973. With respect to the notes receivable as of December 31, 1972, $221,868 of collections were made during 1973 and $7,199 were made after 1973. Respondent, in his notice of deficiency, gave the following explanation: Schedule 1-A Explanation of Adjustments (a) It is determined that gross receipts are increased $453,472.00 in 1972 and $162,533.00 in 1973 as shown below because the accrual method of accounting must be used in lieu of the hybrid method used in 1972 and 1973, since the accrual method more clearly reflects the income of the taxpayers. 1972 net receipts per return
$ 631,984.00
Add: Accounts Receivable at 12-31-72
$476,940.00
Less: Specific bad debt losses
23,468.00
453,472.00
Total
$1,085,456.00
Less: Accounts Receivable at 1-1-72
348,261.00
Gross receipts as corrected
$ 737,195.00
Gross receipts reported
631,984.00
Increase gross receipts
$ 105,211.00
Add: Section 481 adjustment
348,261.00
Increase taxable income for 1972
$ 453,472.00
1973 net receipts per return
$ 908,072.00
Add: Accounts Receivable at 12-31-73
$644,571.00
Less: Specific bad debt losses
28,566.00
616,005.00
Total
$1,524,077.00
Less: Accounts Receivable at 1-1-73
453,472.00
Gross receipts as corrected
1,070,605.00
Gross receipts reported
908,072.00
Increase taxable income for 1973
$ 162,533.00
*754 Respondent allowed deductions for specific bad debt losses in the amounts of $23,468 and $28,566, respectively, for 1972 and 1973. Such amounts were based on the transactions which had been found in the "skip file" maintained by ABC Motors. Respondent computed a specific bad debt loss as of the end of the year for each of such transactions by subtracting actual cash receipts (plus trade-in allowance, if applicable) from the selling price. Petitioners, in an amendment to their petition, alleged the following: 6.In the alternative, in the event the Court should determine that Petitioners are required to report income from sales of automobiles on the accrual method, Petitioners allege that they are entitled to a deduction for bad debts using the reserve method. Such deduction would not be less than $314,339 for the taxable year 1972 and $125,915 for the taxable year 1973 instead of the amounts of $23,468 allowed by the Commissioner for the year 1972 and $28,566 allowed by the Commissioner for the taxable year 1973. OPINION Section 446 provides that taxable income is to be computed *755 under the taxpayer's normal method of accounting unless that method does not clearly reflect income, in which event taxable income is to be computed under such method as, in the opinion of the Commissioner, does clearly reflect income. Section 446(a) and 446(b). Respondent determined that petitioners' use of the cash method of accounting to reflect the sales of automobiles made in their used car business did not clearly reflect income. Section 1.446-1(c)(2)(i), Income Tax Regs., requires that in all cases where it is necessary to use inventories, an accrual method of accounting be used with regard to purchases and sales. Petitioners contend that their use of the cash method to account for sales of cars in their business does clearly reflect income, and that therefore, respondent improperly required them to use an accrual method. As a part of this argument, petitioners maintain that even under an accrual method, they would not have to accrue the notes received from their customers into income because such notes are of doubtful collectibility. Petitioners, in the alternative, assert that if they are required to use an accrual method of accounting they *756 are entitled to deductions for additions to a reserve for bad debts under section 166. Respondent maintains that petitioners' method of accounting is essentially a hybrid method in that petitioners, when a sale occurred, immediately accrued the cost of the automobile sold but reported the income from the sale only when payments were received. Respondent maintains that petitioners' taxable income is not clearly reflected under such method. Respondent also asserts that petitioners are not entitled to maintain a reserve for bad debts since they have not properly elected to have a reserve, and thus are entitled only to deductions for specific bad debts. Petitioners' sales of automobiles are the major, if not sole, income-producing factor in their used car business. Petitioners maintained inventories at the beginning and end of each year of the cars purchased and sold in the course of their used car business, and they do not dispute here that they are required to keep inventories.See section 1.446-1(a)(4)(i), Income Tax Regs. Petitioners, however, contend that their business is "unique" and that they should not be required to use an accrual method of accounting *757 to reflect their sales of automobiles as required under respondent's regulation cited above. Respondent's regulation is of long-standing and has repeatedly been approved by the Courts. Iverson's Estate v. Commissioner,255 F.2d 1, 3-5 (8th Cir. 1958), affg. 27 T.C. 786 (1957); Caldwell v. Lcommissioner,202 F.2d 112, 114 (2nd Cir. 1953), affg. on this issue a Memorandum Opinion of this Court; Ezo Products Co. v. Commissioner,37 T.C. 385, 392 (1961).In Caldwell,supra 114, the Court stated: The use of inventories in computing income results in stating the expenses of a years operations in terms of the cost of the goods actually sold during that year. Thus the profit from these operations will be stated accurately only if the income from all sales made during the years is taken into consideration. This requires use of the accrual method of determining income since the cash receipts method obviously does not reflect the actual sales made during the year where, as in the present case, a substantial *758 part of these sales --from 90 to 95 percent according to the finding--is made on credit. Petitioners at trial offered the expert testimony of several individuals who either practice or teach accounting. These witnesses generally acknowledged that where inventories are utilized, an accrual method of accounting should also be used in order that income be clearly reflected. However, these witnesses further stated that in petitioners' case, they were of the opinion that the use of the cash method of accounting clearly reflected income. One of these witnesses also stated that in his opinion it would be much more costly and complicated for petitioners to use an accrual method of accounting rather than the cash method. We do not accept the testimony of these experts that petitioners' use of the cash method clearly reflects petitioners' taxable income. Petitioners, in utilizing inventories, at the end of a year will have removed a car from their inventory because of its sale during the year to a customer. See generally section 1.471-1, Income Tax Regs.[3] Accordingly, the car, since it no longer is included in petitioners' closing inventory, increases petitioners' *759 cost of goods sold for the taxable year. However, under the cash method utilized by petitioners to report the income derived from the sales of the cars, income is reported only when payments are actually received. As a result, there is a potential mismatching of income and cost under the method of accounting utilized by petitioners. It is because of such mismatching that section 1.446-1(c)(2)(i), Income Tax Regs., requires that an accrual method of accounting be used with regard to purchases and sales where inventories are required to be maintained. The use of an accrual method is required in order that income be accurately reflected.[4]Caldwell v. Commissioner,supra at 114; Boynton v. Pedrick,136 F. Supp. 888, 891 (S.D.N.Y. 1954), affd. 228 F.2d 745 (2nd Cir. 1955). Although the notes petitioners receive from the sales of automobiles normally provide for payment within six months, receipt of payments on the notes may extend into the years following the year in which the sales have been made. Petitioners have not submitted calculations showing that the difference between the net income reported under their method *760 and respondent's method would be inconsequential for the years in issue. Even assuming such a showing, we still would have to conclude that the method utilized by petitioners affords significant potential for distortion of their income. See Wilkinson-Beane, Inc. v. Commissioner,420 F.2d 352, 355-356 (1st Cir. 1970), affg. a Memorandum Opinion of this Court. *761 Petitioners' second argument in support of their contention that they should not be required to use an accrual method, is that they should not be required to accrue as income the notes received since the notes are of doubtful collectibility. Petitioners point out that even under an accrual method in certain situations where, because of the debtor's insolvency, payment on his note is improbable, no accrual of the note into income is required. In effect, petitioners are urging that, since the notes received would not be required to be accrued as income under an accrual method, they should be allowed to remain on the cash method. An accrual method taxpayer must include income in the year in which all events have occurred fixing his right to the income where the amount thereof can be determined with reasonable accuracy. Commissioner v. Hansen,360 U.S. 446, 463-464 (1959); Spring City Foundry Co. v. Commissioner,292 U.S. 182, 184-185 (1934). See also, section 1.451-1(a), Income Tax Regs. Petitioners acknowledge that the first *762 requirement for accrual of income is satisfied when a sale is concluded since all events have occurred fixing petitioners' rights to the sales price. Petitioners contend, however, that it is uncertain how much of the face amount of a note will actually be collected since only a small percentage of the total notes received in petitioners' business are paid in full by their customers. The courts have recognized a noncollectibility exception under which a taxpayer is not required to accrue income where the income is of doubtful collectibility or it is reasonably certain that it will not be collected. H. Liebes and Co. v. Commissioner,90 F.2d 932 (9th Cir. 1937), affg. 34 B.T.A. 677 (1936); Corn Exchange Bank v. United States,37 F.2d 34 (2nd Cir. 1930); Harmont Plaza, Inc. v. Commissioner,64 T.C. 632, 649-650 (1975), affd. 549 F.2d 414 (6th Cir. 1977). However, in determining whether such exception is applicable, it must be recognized that while there is always the possibility that a debtor will default on *763 his note, such possibility alone is not sufficient to defer accrual. First Savings and Loan Association v. Commissioner,40 T.C. 474, 487 (1963). Additionally, mere financial difficulty of the debtor and the fact that a lapse of time is contemplated before actual satisfaction of the note will not constitute the requisite doubtful collectibility. Commercial Solvents Corp. v. Commissioner,42 T.C. 455 (1964). Moreover, it must be firmly kept in mind that this principle of doubtful collectibility is, after all, an exception and that such exception must not be allowed to swallow up the fundamental rule requiring a taxpayer to accrue his right to the income. Georgia School-Book Depository, Inc. v. Commissioner,1 T.C. 463, 469 (1943). The burden of proof is on petitioners to show that there was reasonable doubt as to the collectibility of the notes. Jones Lumber Co., Inc. v. Commissioner,404 F.2d 764, 767 (1968), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure. Such reasonable doubt as to collectibility must be established as of the time the right to such income *764 arises. Spring City Foundry Co.,supra at 185; Jones Lumber Co., Inc.,supra at 766. It is also to be noted that the exception has typically been applied where the debtor is insolvent or in fact bankrupt. Harmont Plaza, Inc.,supra at 650. This Court, in its prior decisions, has required an extremely strong showing to be made in order for a taxpayer to qualify under this exception. In Georgia School-Book Depository, Inc.,supra, we stated that there must be a definite showing of the insolvency of the debtor making payment improbable. Cf. Jones Lumber Co.,supra at 766. Petitioners in the present case have failed to show with regard to specific notes received from sales in the years in issue, that a particular maker of a note was insolvent at the time the sale occurred. While the evidence of record indicates that petitioners in general are likely only to collect a portion of the total face amount of notes received by them, they have not made a satisfactory showing that specific notes are of such real doubtful collectibility as to not be accrued into income. Mr. Moore in his testimony at trial acknowledged that he attempted *765 not to extend credit to persons who are in bankruptcy. Although Mr. Moore and Mrs. Moore may only have anticipated collecting a portion of the total face amount of the notes received during a year, certainly, as of the time a sale was made to a particular customer, they anticipated collecting at least a significant portion of the purchase price from the customer. Undoubtedly, if petitioners had real doubt as to collecting any amount whatsoever, they would have refused to extend credit to the prospective customers. Such being the case, the amounts represented by the notes should be accrued into income. As was pointed out by the Supreme Court in Spring City Foundry Co.,supra at 185: On an accrual basis, the "total sales," to which the regulation refers, are manifestly the accounts receivable arising from the sales, and these accounts receivable, less the cost of the goods sold, figure in the statement of gross income. If such accounts receivable become uncollectible, in whole or part, the question is one of the deduction which may be taken according to the applicable *766 statue. * * * That is the question here. It is not altered by the fact that the claim of loss relates to an item of gross income which had accrued in the same year. [Citations omitted] As we previously noted, petitioners have failed to bring to our attention any specific notes received in the years in issue which were, as of the time of sale, of sufficiently doubtful collectibility as to not be accrued into income. Even assuming that certain notes received by petitioners were of doubtful collectibility so as not to be properly accrued as income, this nevertheless would not excuse petitioners from being required to use an accrual method. In conclusion, we hold that respondent properly required petitioners to use an accrual method of accounting pursuant to section 446(b) in order that petitioners' taxable income be clearly reflected. Having held that petitioners are required to use an accrual method of accounting, we must now reach petitioners' alternative contention that they should be allowed deductions for reasonable additions to a reserve for bad debts under section 166(c).
*767 Section 166(a) generally provides that deductions are allowable for specific debts which become worthless within the taxable year. [5] However, in lieu of a deduction for specific bad debts, a taxpayer under section 166(c) may elect to have a deduction for a reasonable addition to a reserve for bad debts. A reasonable addition is the amount necessary to bring the reserve balance up to the level that can be expected to cover losses properly anticipated on debts outstanding at the end of the taxable year. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 546 (1979). The addition will depend primarily on the debts outstanding as of the close of the taxable year and the total amount of the existing reserve. Section 1.166-4(b)(1), Income Tax Regs. The cases have further recognized that since the statute specifically provides for allowance in the discretion of the Commissioner of a deduction for a reasonable addition to a reserve for bad debts, a taxpayer bears a heavy burden of proof in seeking deduction for an addition where the deduction has been disapproved by respondent. The evidence presented on balance must show an abuse of discretion *768 and establish that the Commissioner acted arbitrarily. Atlantic Discount Co., Inc. v. United States,473 F.2d 412, 414-415 (5th Cir. 1973); Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. 735, 741 (1963). In the instant case, respondent has taken the primary position that petitioners have not timely and properly elected the reserve method in the manner prescribed by the regulations. See Sections 1.166-1(b) and -4(c), Income Tax Regs. As a further part of this argument, respondent points out that while the statute gives the taxpayer the option of either utilizing the reserve method or claiming deductions with respect to specific debts for the taxable year in which the particular debts become worthless, once having elected a particular method, a taxpayer must continue to utilize such method, unless he receives the Commissioner's permission to change. Sections 1.166-1(b)(2) and -1(b)(3), Income Tax Regs. Petitioners did *769 not raise any claim that they were entitled to use the reserve method until after commencement of this present case when the claim was raised by was of an amendment to their petition, nor have they utilized the reserve method for prior years. Respondent contends that petitioners may elect the reserve method for the years in issue only if they can establish that they were not entitled to deductions for bad debts in prior taxable years. See Fountain v. Commissioner,59 T.C. 696, 706-707 (1973). In Travis v. Commissioner,47 T.C. 502 (1967), revd. on another issue 406 F.2d 987 (6th Cir. 1969), we dealt with the same arguments raised in the instant case. In Travis, the taxpayer ran a dance studio business and for the most part used an accrual method of accounting, except that she improperly accounted for her income with respect to certain types of contracts by including in income only the payments that were actually received. In that case we rejected respondent's contention that the taxpayer was precluded from selecting the reserve method with respect to possible bad debts arising from such contracts because of a failure to comply *770 with Sections 1.166-1(b) and -4(c), Income Tax Regs., and stated (at 514): The regulations cited by the respondent do not provide that the taxpayer must select the reserve method in a particular year or forever forfeit his right to do so. They are designed to require the disclosure of information upon which the district director may base a judgment as to whether the taxpayer is entitled to use the reserve method and as to the reasonableness of the amount claimed as a deduction as an annual addition to the reserve. Having once chosen the reserve method or the specific chargeoff method the taxpayer would be bound thereby.* * * Here, however, there was no selection of either method since none was required under the petitioner's assumption as to the proper method of accounting for student enrollment agreements and budget plan contracts. Now that that assumption is proved to have been incorrect petitioner should be able to claim the benefits she would have been able to claim had she proceeded initially on the correct assumption. If she is to be penalized for having improperly reported income *771 in 1958 there are other sections of the Code specifically designed to permit the imposition of penalties. * * * We therefore reject the respondent's contentions and disregard the corporation's failure to comply with the formal requisites of the regulations. In Travis, we relied heavily on a case, Caldwell v. Commissioner,supra at 116-117, decided under the 1939 Code in which the Court of Appeals for the Second Circuit reached a similar conclusion. We agree with petitioners that they are entitled to adopt the reserve method. Under their prior method of accounting, petitioners would not be entitled to claim any deduction for specific debts which became worthless in a taxable year. Petitioners would not be entitled to claim any deduction for specific bad debts since the basis for determining the amount of the deduction under section 166 in respect of a bad debt is the same as prescribed for determining adjusted basis under section 1011. Because petitioners would not have taken the uncollected portion of the notes into income, they would have no basis upon which to claim a specific bad debt deduction. Section 1.166-1(d) and -1(e), Income Tax Regs. It is only upon *772 their being required to use an accrual method that petitioners are entitled to claim bad debt deductions with respect to the uncollected portion of notes received by them from sales of automobiles. Since it is only upon having their method of accounting changed by respondent that petitioners are for the first time entitled to claim bad debt deductions on the notes, they are entitled to elect the reserve method. Caldwell,supra at 116-117; Travis v. Commissioner,supra at 513-514. [6]
Prior to determining the amount of the additions, it is incumbent on us to correctly determine *773 th e increased taxable income petitioners would have under an accrual method of accounting prior to the allowance of any deductions for bad debts under the reserve method. Respondent, in attempting to determine the amount of income which should properly be reported by petitioners under an accrual method, utilized a shortcut method which must be modified if petitioners are to be allowed bad debt deductions under the reserve method. Essentially, respondent took the cash receipts reported on petitioners' return, added to this the notes receivable he determined to be outstanding as of the end of the year and then subtracted the notes receivable as of the beginning of the year. Collections on the beginning receivable to not go into income for the year since under an accrual method the transactions represented by such receivable should have been taken into income in the prior year in which the sales occurred. The ending receivables, to the extent they are due to sales occurring during the year, would go into income. The shortcut method employed, however, assumes that beginning receivables were (1) either collected and therefore reported on petitioners' return as part of their cash receipts, *774 or (2) to the extent not collected, were again included in ending receivables. The record indicates, however, that the amount of 1971 receivables again included in the notes receivable as of December 31, 1972, is only a small percentage of such receivables. The same is true with respect to 1972 receivables included in receivables as of December 31, 1973. The parties have stipulated that respondent in compiling receivable at yearend omitted transactions where the car had been repossessed. Since notes of terms of six months were received with respect to most of the sales, it is very likely that the notes would either be paid in full or the cars securing such notes be repossessed by the end of the first year following the year of the sale. Thus, because of the manner in which yearend receivables were compiled by respondent, very few receivables included at the end of one year are again included in yearend receivables of a subsequent year. Additionally, the record clearly shows that approximately 66 percent of the 1971 yearend receivables and slightly more than 50 percent of the 1972 yearend receivables were never collected. As will be discussed more fully, infra, petitioners *775 would be correct in writing off or charging off the uncollected portion of a note once the car securing it is repossessed since the balance owed on the note is uncollectible. These uncollectible balances would not also be included in yearend receivables and respondent properly excluded them in compiling yearend receivables. However, under his shortcut method, respondent once again subtracts out these same uncollectible balances. In effect, this allows petitioners' specific bad debt deductions in 1972 of the 1971 receivables which became uncollectible and in 1973 of the 1972 receivables which became uncollectible. Such allowances of specific bad debt deductions as to these receivables are improper if petitioners are also to be allowed bad debt deductions under the reserve method with respect to such receivables. We have computed the increase in petitioners' taxable income in 1972 and 1973 eliminating the specific bad debt deductions in effect allowed under respondent's computations.These amounts, which are $352,777 and $394,413, respectively, exclusive of the section 481 adjustment and prior to the allowance of any bad debt deductions under the reserve method, are arrived at as follows: *776 1972
1972 net receipts per return
$631,984 Add: Accounts receivable at 12/31/72
476,940 1,108,924 Less: Portion of such accounts receivable
which consisted of 1971 receivables
(7,376)
1,101,548 Less: Actual collections during 1972
on 1971 receivables
(116,787)
Gross receipts corrected
984,761 Gross receipts reported
(631,984)
Increase in taxable income prior to
allowance of bad debt deduction under
reserve method
$352,777 1973
1973 net receipts per return
$908,072 Add: Accounts receivable at 12/31/73
644,571 1,552,643 Less: Portion of such accounts receivable
which consisted of 1972 receivables
(26,272)
1,526,371 Less: Actual collections during 1973
on 1972 receivables
(221,868)
1,304,503 Less: Actual collections during 1973
on 1971 receivables
(2,018)
Gross receipts corrected
1,302,485 Gross receipts reported
(908,072)
Increase in taxable income prior to
allowance of bad debt deduction under
reserve method
$394,413 We must now determine the amount of the additions which may be made to petitioners' reserve for bad debts. *777 In determining what is a reasonable addition to a taxpayer's reserve for bad debts, a taxpayer's actual credit experience from prior years offers the best index. Thor Power Tool Co.,supra at 549. [7] The record does not contain specific evidence of ABC Motors' credit experience of prior years. The only evidence presented concerns actual and estimated collections for receivables outstanding at the end of 1972 and 1973, and also collections for receivables outstanding at the end of 1971 on which an adjustment under section 481 was based. The amount that is a reasonable addition to the reserve should be determined in light of facts in existence at the close of the taxable year. Section 1.166-4(b)(1), Income Tax Regs. Actual loss experience subsequent to the close of the taxable year should ordinarily not enter into the calculation of what is a reasonable addition to the reserve, except for purposes of confirming that the amount estimated is reasonable. Westchester Development Co. v. Commissioner,63 T.C. 198, 212-213 (1974); Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. 735, 741 (1963). *778 The evidence of record, however, indicates that petitioners' credit experience in the years in issue and in the preceding year 1971 did not differ in any substantial respects from that in prior years. Mr. Moore testified that his business remained unchanged from year to year, except for there being an increase in the prices at which automobiles were sold. The evidence shows that without consideration of the value of repossessed cars, the collection on the receivables at December 31, 1971, was 34 percent, and the collection on the receivables at the end of 1972 was slightly less than 50 percent. Respondent did not change the system used by petitioners for taking cars repossessed into inventory at no value. Also, respondent did not include in notes receivable at the end of each year notes on cars which had been repossessed. However, the record shows that there were notes receivable on cars sold in 1971 included in receivables at December 31, 1972, and notes on cars sold in 1972 included in receivables at December 31, 1973. We conclude that the amount required in reserve for bad debts at the end of the years 1971, 1972 and 1973, would be equal to 50 percent of the receivables. The *779 record indicates that the amount of the 1971 receivables was only an estimated figure. Thus, a larger portion of such receivables we conclude consists of amounts due with respect to transactions occurring in prior years than is the case with respect to 1972 and 1973 receivables. That a higher proportion of older transactions were included in the 1971 receivables is borne out by the fact that the percentage of collections is significantly lower. Although a taxpayer using the reserve method in the years subsequent to his establishing a reserve will not receive a deduction for chargeoffs, such chargeoffs will reduce the amount already in the reserve and therefore affect the computation of the addition. The determination of whether a debt is worthless is to be made on the same basis, regardless of whether the taxpayer *780 takes deductions for specific bad debts or uses the reserve method. Paramount Liquor Co. v. Commissioner,242 F.2d 249, 258-259 (8th Cir. 1957), affg. a Memorandum Opinion of this Court. In deciding whether a debt has become bad, the test to be used is whether a reasonably prudent businessman would conclude that it is uncollectible. Andrew v. Commissioner,54 T.C. 239, 248 (1970). See also, section 1.166-2(a), Income Tax Regs. Thus, whether a debt has become bad in a particular year is a question of fact. However, the resolution of such issue is to be based on objective factors and not merely on the taxpayer's subjective judgment as to worthlessness.
Respondent allowed petitioners a deduction for specific bad debts with respect to transactions placed in the "skip file." However, the record shows that the portion of a note receivable which is uncollected upon repossession of the car should also be charged off. At trial, the lawyer who handled petitioners' legal affairs over the years testified. This witness stated that on past occasions petitioners sought his advice with respect to possible legal action against defaulting *781 customers. The lawyer stated that he advised petitioners that it would be futile to bring a suit to obtain a judgment against their customers since, as a practical matter, they are judgment proof. The record indicates that many of petitioners' customers are either welfare recipients, transient workers or persons in very low-paying jobs. The lawyer testified that Texas law does not permit garnishment of wages. Mr. Moore, in his testimony, stated that during all the years he has been in business, he has never sued a customer to collect on any note because it would not have been worth the time and expense. He stated that when a customer is in default, his ultimate recourse is to reposses the car and that prior to repossession, he, on many occasions, is even willing to renegotiate more lenient terms of payment. Since respondent, in compiling notes receivable, excluded those notes which had been paid in full or where the car had been repossessed, and since we know the actual collections made subsequently on receivables, we can derive the amount of such receivables which should be charged off because the car securing the note was repossessed. [8] Under the circumstances here, petitioners *782 need not have undertaken the futile step of legal action since in all probability a lawsuit would not result in the satisfaction of execution on judgment. Section 1.166-2(b), Income Tax Regs.
*783 We find that petitioners are entitled to deductions for reasonable additions to a reserve for bad debts in the amounts of $311,906 and $346,539, respectively, for 1972 and 1973, in lieu of the deduction for specific bad debt losses allowed by respondent. These amounts are to be deducted from income as we have recomputed it by eliminating specific bad debts which were in effect allowed under respondent's method of computation. A deduction of $174,130 is also to be allowed with respect to the section 481 adjustment made by respondent.[9] See Swartz v. Commissioner,42 T.C. 859 (1964). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
2. In the petition a claim for attorneys' fees is made. However, this issue is not discussed in petitioners' brief and we assume it has been dropped. In any event, this Court has no authority to award attorneys' fees in cases instituted on or prior to February 28, 1983. McQuiston v. Commissioner,78 T.C. 807↩ (1982)
3. This regulation states, in pertinent part, as follows: Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold * * *, title to which has passed to the purchaser. * * * ↩
4. In instances where inventories are so small as to be of no consequence or consist primarily of labor, the courts have recognized that the presence of inventories is not necessarily sufficient to require a change in the taxpayer's method of accounting. Ezo Products Co. v. Commissioner,37 T.C. 385, 392↩ (1961). However, in the instant case petitioners' inventories of cars cannot be said to be of no consequence.
5. Petitioners have not contended that they are entitled to deductions for specific debts which became partially worthless.↩
6. We have not overlooked the fact that in petitioners' 1972 return, the Schedule C reporting the profit and loss from their used car business claims a deduction of $240 for bad debts arising from sales or services. We conclude that the bad debt deduction claimed was not with respect to any of the notes petitioners received from the sales of used cars. Under the method of accounting used by petitioners, they would not be entitled to claim a bad debt deduction on the remaining balance owned on such notes since such balance would not have been previously included in income.↩
7. To be sure, a change in business circumstances in the current year may require that a smaller or larger addition be allowed than is indicated by the experience of past years. See Valmont Industries, Inc. v. Commissioner,73 T.C. 1059, 1068-1069↩ (1980).
8. We have determined that $247,566 is the amount of notes to be charged off in 1972. In deriving this amount we must ascertain the portion of the 1971 receivables remaining uncollected as of December 31, 1972, which are uncollectible. On the $348,261 of receivables as of December 31, 1971, $116,787 was collected during 1972, leaving a balance outstanding of $231,474. Of this $231,474 portion outstanding, the respondent included only $7,376 of such 1971 receivables again in notes receivable as of December 31, 1972. Therefore, as to the $224,098 of uncollected 1971 receivables, the cars securing their payment were repossessed. Such $224,098 of 1971 receivables are uncollectible and should be charged off, in addition to the $23,468 of debts previously allowed by respondent as a specific bad debt loss for 1972. Similarly, for 1973 we find that $234,158 is the amount of notes to be charged off. We have determined this amount as follows: ↩
$476,940 1972 receivables
(221,868)
collections made during 1973
255,072 uncollected balance of 1972 receivables
as of December 31, 1973
(26,272)
1972 receivables included in notes
receivable as of December 31, 1973
228,800 1972 receivables which became uncollectible
in 1973
5,358 1971 receivables which became uncollectible
in 1973
234,158 28,566 previously allowed specific bad debt loss
$262,724 9. We have computed the amounts allowed petitioners as reasonable additions to their bad debt reserve as follows: ↩
Amount in
Notes
Reserve at
Chargeoffs
Balance
Amount
receivable
beginning
during
in
needed in
at year end
of year
year
reserve
reserve
Addition
1971
$348,261
$174,130
$174,130
1972
476,940
$174,130
$247,566
$ (73,436)
238,470
311,906
1973
644,571
238,470
262,724
(24,254)
322,285
346,539